DANIEL M. ORTNER (California State Bar No. 329866)
daniel.ortner@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### FRESNO DISTRICT

| | |
|---|---|
| LOREN PALSGAARD, ET AL., | Civil Action No.:<br>1:23-cv-01228-ADA-CDB |
| *Plaintiffs*, | |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| SONYA CHRISTIAN, ET AL., | |
| *Defendants*. | |
| | Date: October 2, 2023<br>Time: 1:30 pm PDT<br>Place: Courtroom 1, 8th Floor<br>Judge: The Honorable Ana de Alba |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ................................................................................................2

   California Community Colleges Adopts the DEIA Rules and Implementation Guidelines. ....3

   State Center Incorporates and Enforces the DEIA Rules through the Faculty Contract...........5

   The DEIA Rules and Faculty Contract Force Plaintiffs to Alter Their Protected Academic Speech. ........................................................................................................7

   Plaintiffs File Their Complaint Seeking Preliminary and Permanent Injunctive and Declaratory Relief. ........................................................................................10

ARGUMENT....................................................................................................................10

   I.   Plaintiffs Are Likely to Succeed on the Merits of Their First and Fourteenth Amendment Challenges. ........................................................................................10

      A. The First Amendment Protects Plaintiffs' Academic Freedom. ........................11

      B. The DEIA Rules And Faculty Contract Are Viewpoint Based and Cannot Satisfy Strict Scrutiny. ........................................................................................12

      C. The DEIA Rules and Faculty Contract Unlawfully Compel Speech. ................15

      D. The DEIA Rules and Faculty Contract Impose an Unlawful Prior Restraint on Professors........................................................................................18

      E. The DEIA Rules and Faculty Contract Are Substantially Overbroad...............19

      F. The DEIA Rules and Faculty Contract Are Unconstitutionally Vague.............21

   II.   Plaintiffs Satisfy the Remaining Requirements for a Preliminary Injunction. .......23

      A. Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction.......23

      B. The Balance of Equities and Public Interest Favor a Preliminary Injunction....24

      C. Plaintiffs Should Not Be Required to Provide a Security Bond on the Preliminary Injunction. ........................................................................................24

CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*303 Creative LLC v. Elenis,*
    143 S. Ct. 2298 (2023)..................................................................... 17

*Adamian v. Jacobsen,*
    523 F.2d 929 (9th Cir. 1975) ......................................................... 23

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ....................................................... 10

*Barone v. City of Springfield, Or.,*
    902 F.3d 1091 (9th Cir. 2018) ................................................. 18, 21

*Bd. of Educ. v. Pico,*
    457 U.S. 853 (1982)....................................................................... 12

*Borough of Duryea v. Guarnieri,*
    564 U.S. 379 (2011)......................................................................... 5

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
    29 F.4th 468 (9th Cir. 2022) ......................................................... 24

*Ciambriello v. County of Nassau,*
    292 F.3d 307 (2d Cir. 2002) ........................................................... 5

*Cohen v. San Bernadino Valley Coll.,*
    92 F.3d 968 (9th Cir. 1996) ......................................................... 22

*Cole v. Richardson,*
    405 U.S. 676 (1972)....................................................................... 16

*CTIA – The Wireless Ass'n v. City of Berkeley, Cal.,*
    928 F.3d 832 (9th Cir. 2019) ....................................................... 23

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014) .............................................. 1, 11, 18

*Doe v. Harris,*
    772 F.3d 563 (9th Cir. 2014) ................................................... 10, 24

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) ..................................................... 24

*Elfbrandt v. Russell,*
    384 U.S. 11 (1966)......................................................................... 23

iii

*Elrod v. Burns,*
　　427 U.S. 347 (1976).............................................................................. 23

*Fuentes v. Shevin,*
　　407 U.S. 67 (1972)................................................................................. 5

*Gete v. I.N.S.,*
　　121 F.3d 1285 (9th Cir. 1997) ............................................................... 5

*Grayned v. City of Rockford,*
　　408 U.S. 104 (1972)....................................................................... 21, 22

*Hardy v. Jefferson Cmty. Coll.,*
　　260 F.3d 671 (6th Cir. 2001) ............................................................... 11

*Hernandez v. City of Phoenix,*
　　43 F.4th 966 (9th Cir. 2022) ............................................................... 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
　　515 U.S. 557 (1995)............................................................................ 15

*Iancu v. Brunetti,*
　　139 S. Ct. 2294 (2019)........................................................................ 12

*Johnson v. Couturier,*
　　572 F.3d 1067 (9th Cir. 2009) ............................................................ 24

*Jorgensen v. Cassiday,*
　　320 F.3d 906 (9th Cir. 2003) .............................................................. 24

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
　　385 U.S. 589 (1967)...................................................................... passim

*Long Beach Area Peace Network v. City of Long Beach,*
　　574 F.3d 1011 (9th Cir. 2009) ............................................................ 15

*McCauley v. Univ of the V.I.,*
　　618 F.3d 232 (3d Cir. 2010) ............................................................... 14

*Matal v. Tam,*
　　582 U.S. 218 (2017)................................................................. 13, 14, 20

*Melendres v. Arpaio,*
　　695 F.3d 990 (9th Cir. 2012) .............................................................. 24

*Meriwether v. Hartop,*
　　992 F.3d 492 (6th Cir. 2021) ................................................... 11, 12, 13

iv

*NAACP v. Button*,
  371 U.S. 415 (1963).............................................................................. 21

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018)............................................................. 14, 15, 16

*Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
  475 U.S. 1 (1986).................................................................................. 17

*Papish v. Bd. of Curators of the Univ. of Mo.*,
  410 U.S. 667 (1973)...................................................................... 14, 20

*Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*,
  2022 WL 16985720, at *37 (N.D. Fla. Nov. 17, 2022)........................... 12, 13, 15

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205*,
  391 U.S. 563 (1968).............................................................................. 18

*Progressive Democrats for Soc. Just. v. Bonta*,
  73 F.4th 1118 (9th Cir. 2023) ............................................................. 18

*Regents of the Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978).............................................................................. 14

*Reno v. ACLU*,
  521 U.S. 844 (1997).............................................................................. 21

*Riley's Am. Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022) ....................................................... 23, 24

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*,
  605 F.3d 703 (9th Cir. 2010) .................................................. 11, 13, 19

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995)....................................................................... 1, 12, 14

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990)................................................................................ 16

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) .............................................................. 10

*Shelton v. Tucker*,
  364 U.S. 479 (1960).............................................................................. 16

*Snyder v. Phelps*,
  562 U.S. 443 (2011).............................................................................. 20

v

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  143 S. Ct. 2141 (2023) ................................................................................................. 20

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957) ............................................................................................. 1, 2, 19

*United Food and Com. Workers Loc. 99 v. Brewer*,
  817 F. Supp. 2d 1118 (D. Ariz. 2011) ............................................................................ 25

*United States v. National Treasury Employees Union*,
  513 U.S. 454 (1995) ................................................................................................. 18, 19

*United States v. Stevens*,
  559 U.S. 460 (2010) ................................................................................................. 19, 21

*United States v. Williams*,
  553 U.S. 285 (2008) ......................................................................................................... 21

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ......................................................................................................... 15

*Waln v. Dysart Sch. Dist.*,
  54 F.4th 1152 (9th Cir. 2022) ......................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................................... 10, 23

*Wright v. Universal Maritime Service Corp.*,
  525 U.S. 70 (1998) ............................................................................................................. 5

## OTHER AUTHORITIES

John S. Cargozian, *The University of Califronia's Loyalty Oath Fight*,
  Cal. Sup. Ct. Hist. Society (March 10, 2023) ................................................................. 16

Oriane Georgeac and Aneeta Rattan, *The business case for diversity backfires:
  Detrimental effects of organizations' instrumental diversity rhetoric for
  underrepresented group members' sense of belonging*,
  J Pers Soc Psychol. 2023 ................................................................................................... 5

Suzanne Nossel, *No, Hateful Speech is Not the Same Things as Violence*,
  Washinton Post (June 22, 2017) ..................................................................................... 13

**INTRODUCTION**

Plaintiffs are six tenured community college professors in the State Center Community College District who strive to make their classrooms places where their students "remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). For instance, Professor Palsgaard assigns students in his English class challenging readings like Martin Luther King Jr.'s *Letter from Birmingham Jail* and encourages them to debate and discuss contentious issues, like the death penalty and drug legalization. Meanwhile, Professors Blanken and de Morales provide their students a pedagogically sound Chemistry education including teaching them about chemists like Marie Curie and Robert Boyle who have made the greatest contributions to science regardless of their ethnicity or country of origin. Each of the Plaintiffs are highly effective educators who challenge their students and promote academic freedom.

But California Community Colleges' new diversity, equity, inclusion, and accessibility rules (DEIA Rules) prevent these professors from continuing to teach in the classroom in a manner that encourages "thought and experiment" as well as "debate and discussion on contentious issues." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995). In doing so, the DEIA Rules trample on the First Amendment rights of faculty concerning "speech related to scholarship or teaching." *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014) (internal citations omitted).

Indeed, the DEIA Rules *require* faculty to *endorse* contested concepts like the view that individuals must advocate for race-conscious remedies to overcome systemic racism ("anti-racism") and reject the idea of "merit" as "protect[ing] White Privilege under the guise of standards." The DEIA Rules also warn faculty against "weaponizing academic freedom" to "inflict curricular trauma" on students. The government uses this vague and threatening language to turn routine educational practices like assigning controversial and challenging books into grounds for discipline.

Plaintiffs are subject to a Faculty Contract that ratifies and imposes the DEIA Rules on all State Center faculty. Under the Faculty Contract, they are evaluated regularly for their devotion to

1

the State's mandated DEIA principles and how they have "put those principles into practice" in the classroom. That means if Plaintiffs want to advance in and keep their jobs, they must parrot the government's position on DEIA in their classrooms or face discipline or even termination.

Questions surrounding DEIA are at the heart of our nation's most challenging and contested conversations. These are exactly the kinds of conversations that many of the Plaintiffs, namely Professors Palsgaard, Druley, Stannard, and Richardson, encourage in the classroom. In other words, they are providing exactly what the Supreme Court said that a college education is for—ensuring that students have "wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (internal citations omitted). California's community colleges use the DEIA Rules not to encourage debate on an important topic, but to end it.

As a result, Plaintiffs no longer feel free to teach as they have taught for decades. Plaintiff Palsgaard fears that if he continues to assign *Letter from Birmingham Jail* (which has a racial slur in it) or shows his class debate videos that discuss and critique the concept of systemic racism, he will be accused of being insufficiently anti-racist or even of "inflicting curricular trauma." Meanwhile, Plaintiffs Blanken and de Morales will be forced to either introduce pedagogically inappropriate concepts in the Chemistry classroom or face possible termination.

The Supreme Court warned against top-down coercion in the classroom almost 70 years ago. "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy*, 354 U.S. at 250. But California has imposed straitjackets as mandatory workplace attire. Plaintiffs seek a preliminary injunction so that they can take those strait jackets off and continue to do what they do best—educate their students.

## STATEMENT OF FACTS

California Community Colleges' new DEIA Rules force faculty members to endorse contested diversity, equity, including and accessibility (DEIA) principles. The State Chancellor published several Implementation Guidelines that expansively interpret the DEIA Rules, which

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

are incorporated into the Faculty Contract. Plaintiffs oppose the mandated DEIA principles and will need to make significant changes to their classrooms or risk discipline or termination if they fail to comply with the DEIA Rules.

**California Community Colleges Adopts the DEIA Rules and Implementation Guidelines.**

In April 2023, the California Community Colleges Board of Governors approved new rules requiring the use of DEIA standards in the performance evaluation and tenure review process of faculty. Verif. Compl. ¶¶ 39–57. Each community college district must confirm its policies and procedures to the requirements in the rules by this October. Verif. Compl. ¶ 47.

The DEIA Rules "make DEIA-focused competencies and criteria a minimum standard and a system-wide requirement." Verif. Compl. Ex. A §§ 53601(a)–(b); Verif. Compl. Ex. C. All faculty must demonstrate proficiency in "DEIA competencies" and "employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles" as conditions of employment. Verif. Compl. Ex. A §§ 53602(b), 53605(a). Districts must "significant[ly] emphasi[ze]" DEIA in employee evaluations and tenure reviews. *Id*. § 53602(c)(4).

The Chancellor's Office published three guidance documents local districts and colleges must use when implementing the DEIA Rules. It also sent a memorandum to the districts introducing the rules. Verif. Compl. Ex. C. Districts are to use these Implementation Guidelines in setting DEIA requirements for faculty. Verif. Compl. Ex. A § 53601(b).

The first guidance document is a list of the competencies and criteria expected of all employees moving forward. Verif. Compl. Ex. B. The *Competencies and Criteria* "define the skills, knowledge, and behaviors that all California Community College . . . employees must demonstrate." *Id.* According to the *Competencies and Criteria*, faculty must endorse the State's DEIA viewpoint. *Id.* They must "[a]cknowledge[]" the "diverse, fluid, and intersectional nature" of identity. *Id.* They must "[d]emonstrate" their "ongoing awareness and recognition" of "structures of oppression and marginalization." *Id.* They must "[s]eek[] DEI and anti-racist perspectives" and continually improve their "own commitment to DEI and internal biases." *Id.*

The *Competencies and Criteria* require California Community College professors to

1   "[p]romote[]" and "incorporate[]" a "DEI and anti-racist pedagogy" into their teaching. *Id.* They

2   must "promote[] a race-conscious and intersectional lens" and be "culturally affirming." *Id.*

3       The requirements of the *Competencies and Criteria* do not end when faculty leave the

4   classroom. They are expected to "advocate[] for and advance[] DEI and anti-racist goals and

5   initiatives" by "participating in DEI groups, committees, or community activities that promote

6   systemic and cultural change to close equity gap and support minoritized groups." *Id.*

7       Second a *Model Principles and Practices* document setting out curricular priorities that

8   districts are encouraged to incorporate and explaining what implementation of the DEIA Rules

9   looks like in practice. Verif. Compl. ¶ 65, Ex D. The *Model Principles* affect many aspects of

10  teaching, including selecting curriculum and the language professors use when teaching. Faculty

11  should supplement their course material with DEIA materials to ensure that "equity frameworks

12  and principles in decision-making are prioritized and addressed." Verif. Compl. Ex. D.

13      The *Model Principles* also tell faculty to change what they teach and how they teach it.

14  The *Model Principles* demand professors "[r]eword language from a colonized mindset to an

15  equity mindset"—for example, by using the term "enslaved" rather than "slaves." *Id.* The *Model*

16  *Principles* even tells them how to think, ordering them to "[s]hift to a collectivism perspective"

17  rather than an "individualist perspective," and to "[w]eave DEI and culturally responsive practice

18  into every course." *Id.* Every discipline and subject must "[u]se culturally responsive practices

19  and a social justice lens." *Id.*  The *Model Principles* likewise tell faculty what they are *not*

20  allowed to say, warning them not to "'weaponize' academic freedom and academic integrity as

21  tools to impede equity" or "inflict curricular trauma on our students" by voicing opinions or

22  assigning materials contradicting the perspectives mandated by the DEIA Rules. *Id.*

23      Third, California Community Colleges provides a *DEIA Glossary of Terms* defining

24  DEIA terms. Verif. Compl. Ex. E. The State Chancellor included a link to the *Glossary* in its May

25  2023 memorandum to districts, urging them to refer to the *Glossary* for help "understanding" the

26  DEIA Rules. Verif. Compl. Ex. C. The *Glossary* further imposes the State's mandatory DEIA

27  viewpoint. Verif. Compl. Ex. E. For instance, the *Glossary* defines "color blindness" as a "racial

28  ideology" which "perpetuates existing racial inequalities and denies systematic racism." *Id.* But

4

1    Plaintiffs believe color-blind policies are the best way to resolve racial inequalities.[1] *Id.* The

2    *Glossary* denounces the concept of "merit" as "protect[ing] White Privilege under the guise of

3    standards." *Id.* But Plaintiffs Druley and de Morales believe merit ensures neutrality and is crucial

4    for society to overcome a legacy of racism. Verif. Compl. ¶¶ 103, 163.

5    **State Center Incorporates and Enforces the DEIA Rules through the Faculty Contract.**

6            In January 2023, State Center adopted a new Full-Time Faculty Agreement ("Faculty

7    Contract") with the labor union representing State Center faculty. The Faculty Contract ratifies

8    and imposes the DEIA Rules. Verif. Compl. ¶¶ 82-83.[2] *Id.* ¶ 83.

9

10

11

12

13

14

15

16

---

17        [1] *See, e.g.,* Oriane Georgeac and Aneeta Rattan, *The business case for diversity backfires: Detrimental effects of organizations' instrumental diversity rhetoric for underrepresented group members' sense of*
18    *belonging,* J Pers Soc Psychol. 2023 Jan;124(1):69–108.
        [2] The relevant provisions of the Faculty Contract do not constitute a valid, voluntary waiver of
19    Plaintiffs' constitutional rights. Waiver must be "voluntary, knowing, and intelligent" as well as "clear and unmistakable." *See Gete v. I.N.S.*, 121 F.3d 1285, 1293 (9th Cir. 1997) (holding that waiver of
20    constitutional rights in a civil context must be "established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent"); see *also Wright v. Universal Maritime Service Corp.*, 525
21    U.S. 70, 80 (1998) (holding that union waiver of members' statutory rights in a collective bargaining agreement must be "clear and unmistakable").Here, the limitations imposed on Plaintiffs' constitutional
22    rights were not voluntarily bargained for between the faculty union and the District, but instead imposed by the District in order to comply with the State's mandate in the DEIA Rules.  *Fuentes v. Shevin*, 407 U.S.
23    67, 94 (1972) (holding contractual waiver of due process rights invalid where "[t]here was no bargaining power over contractual terms between the parties" because the waiver was part of a form sales contract
24    and a necessary condition of the sale). Nor did Plaintiffs knowingly cede their constitutional rights where the contract terms did not clearly and unmistakably communicate the purported waiver of constitutional
25    rights. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 321–22 (2d Cir. 2002) (holding that collective bargaining agreement did not amount to waiver of constitutional rights where it failed to state explicitly
26    that it was waiving constitutional rights). Finally, the faculty union may not waive Plaintiffs' substantive First and Fourteenth Amendment rights, no matter how clearly the purported waiver is expressed in the
27    contract. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (2011) ("There are some rights and freedoms so fundamental to liberty that they cannot be bargained away in a contract for public employment.").

28

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The following graphic shows the relationship between the DEIA Rules, the Implementation Guidelines, and the Faculty Contract:



Faculty are evaluated on their "demonstration of, or progress toward, diversity, equity, inclusion, and accessibility (DEIA) related competencies and teaching and learning practices that reflect DEIA and anti-racist principles." Verif. Compl. Ex. F at 36–37. Faculty must also demonstrate "knowledge of the intersectionality of social identities" and "recognize the myriad of ways in which people differ, including the psychological, physical, cognitive, and social difference that occur among individuals." *Id.* at 37.

Tenured faculty receive performance evaluations every three years. *Id.* at 29. As part of the evaluation process, faculty members must submit self-evaluations "demonstrat[ing] an understanding of diversity, equity, inclusion and accessibility (DEIA) competencies and anti-racist principles, and how they have put those principles into practice to improve equitable student outcomes and course completion." *Id.* at 35.

If a tenured professor's DEIA performance is inadequate, the professor may be placed on

6

a "plan for improvement" with a limited period of time to correct the deficiency, denied

advancement to a new salary class, or even fired. Verif. Compl. ¶¶ 90–95.

**The DEIA Rules and Faculty Contract Force Plaintiffs to Alter Their Protected Academic Speech.**

Plaintiffs are opposed to the ideas and viewpoints the DEIA Rules and Faculty Contract require them to endorse such as "anti-racism" and "intersectionality." Each Plaintiff objects to endorsing the mandatory DEIA views and would not, but for these requirements, espouse them in the classroom.

Loren Palsgaard is an English instructor at Madera Community College. *Id.* ¶ 115. He teaches students to discuss and debate controversial topics while observing mutual respect. He used to assign challenging reading like Martin Luther King, Jr.'s *Letter from Birmingham Jail,* Victor Davis Hanson's *Mexifornia*, books by William Faulkner, and works by Flannery O'Connor. *Id.* ¶ 118. But he no longer assigns these materials because they contain potentially offensive themes and racial slurs and he does not want to violate the prohibition against "weaponize[ing] academic freedom" and "inflict[ing] curricular trauma." *Id.* ¶¶ 118–19. Palsgaard similarly must now second-guess his long running practice of showing videos of recorded debates highlighting opposing views on the death penalty and drug legalization. *Id.* ¶ 120. He worries that watching videos with arguments in favor of the death penalty and against drug legalization may result in him being accused of failing to "promote[] a race-conscious and intersectional lens" and not being adequately "culturally affirming." *Id.*

James Druley is a philosophy instructor at Madera Community College. Verif. Compl. ¶ 98. Because of the DEIA Rules, he must incorporate the State's DEIA views into his curriculum and the official syllabi of the courses that he teaches despite his disagreements. *Id.* ¶ 100. Druley discusses race and racism in several of his classes and wants to teach his students to reason for themselves and critically consider contested DEIA views. *Id.* ¶ 109. Druley worries if he were to do so now, he may fail to sufficiently demonstrate "culturally responsive practices and a social justice lens." *Id.* ¶ 102. Druley is therefore avoiding voicing his opinions on DEIA issues in class. *Id.* ¶ 108. Instead, he is using vague and indeterminate language and is considering avoiding

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

assigning challenging readings about race altogether. *Id.* Druley wants to assign writings by Malcom X, Martin Luther King, Jr., Frederick Douglass, and W.E.B. DuBois. But Druley is concerned that, under the DEIA Rules, these readings will make him insufficiently "anti-racist" and accused of "weaponiz[ing] academic freedom" and "inflict[ing] curricular trauma" on students. *Id.* ¶¶ 107–109. Druley also teaches that "merit" is indispensable. But because the DEIA Rules now codify merit as "protect[ing] White Privilege under the guise of standards," he cannot. *Id.* ¶ 103. Druley also signed a "Pro-Human Pledge" by a civil rights organization advocating against "DEI and anti-racist goals and initiatives," and in so doing, committed to "treat everyone equally without regard to skin color or immutable characteristic." *Id.* ¶ 105. But now, Druley's positions and actions contradict the DEIA Rules' requirements that he adopt a "race-conscious" viewpoint and "participat[e] in DEI groups, committees, or community activities." *Id.* ¶¶ 105–06.

Michael Stannard is a philosophy instructor at Clovis Community College. Stannard's classes involve discussion of controversial topics such as race, abortion, and LGBT rights. *Id.* ¶ 127. Stannard tells students they can speak freely in his classes as long as they are making an argument and do not resort to name-calling. *Id.* ¶ 128. He encourages his students to engage in vigorous discussion. *Id.* Stannard refuses to speak to people differently based on their race or ethnicity because he believes it is patronizing, offensive, and isolates students based on race or ethnicity. *Id* ¶ 129. But now Stannard worries he will be accused of failing to use "culturally affirming language." *Id.* Like Palsgaard, Stannard is reconsidering whether he can assign Martin Luther King, Jr.'s *Letter from Birmingham Jail. Id.* ¶ 132. He is also unsure about whether he can assign an article against the elimination of standardized testing to eliminate racial disparities. *Id.* ¶ 131. Stannard is concerned that because the works offer perspectives that cut against the "race-conscious," "anti-racist," and "intersectional" lens the DEIA Rules mandate, their inclusion in his classroom would risk his professional future. *Id.* ¶¶ 131–32.

David Richardson is a history instructor at Madera Community College. *Id.* ¶ 139. Richardson's classes include discussions about discrimination, the civil rights movement, and slavery. *Id.* ¶ 141. Richardson encourages debates about controversial ideas but is now afraid to do so due to the new DEIA Rules. *Id.* ¶ 142. For instance, he has asked students to contrast the

views of Booker T. Washington and W.E.B. Dubois and of Martin Luther King and Malcom X. *Id.* ¶ 143. But Richardson fears that by assigning different views about the role of race, he will be accused of "weaponiz[ing] academic freedom" and "inflict[ing] curricular trauma" on his students. *Id.* Richardson is likewise afraid to teach controversial facts, such as the existence of black plantation owners and slaveholders in the American Antebellum South. Richardson is concerned these facts are not "culturally-affirming" and run contrary to the "race-conscious and intersectional lens" required by the DEIA Rules. *Id.* ¶ 144.

Bill Blanken is a chemistry professor at Reedley College. *Id.* ¶ 150.  Blanken emphasizes to his students he will treat them equally and will reward those who work hard regardless of their skin color. *Id.* ¶ 151. In Blanken's pedagogical and professional judgment, DEIA principles do not have a place in a chemistry course because they are not irrelevant. *Id.* ¶ 152. Blanken does not want to include DEIA material because it would necessarily take up time otherwise spent studying chemistry. *Id.* Blanken teaches about the history of chemistry and the great scientists who advanced the field, such as Marie Curie and Robert Boyle. *Id.* ¶ 153. Because he focuses on the scientists that have made the greatest impact on the study of chemistry, regardless of ethnicity or country of origin, he fears that if he continues to teach an accurate history, he will be accused of failing to adopt "culturally responsive practices and a social justice lens." *Id.*

Linda de Morales is a chemistry professor at Madera Community College. *Id.* ¶ 161. Like Blanken, de Morales believes teaching DEIA material in her chemistry courses is pedagogically inappropriate. *Id.* ¶ 162. And she does not plan to alter the teaching of the history of chemistry to focus on the race or ethnicity of scientists. *Id.* De Morales tells her students that if they want to receive a good grade, they need to earn it. *Id.* ¶ 163. But de Morales is now concerned that if she emphasizes the importance of "merit" that she will be accused of "protect[ing] White Privilege under the guise of standards." *Id.* De Morales also shows the inspirational film *Hidden Figures* but is now concerned because the film has been accused of "white washing" and may not be seen as sufficiently "anti-racist." *Id.* ¶ 165.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**Plaintiffs File Their Complaint Seeking Preliminary and Permanent Injunctive and Declaratory Relief.**

On August 17, 2023, Plaintiffs filed a complaint seeking declaratory judgment and preliminary and permanent relief. ECF No. 1. Plaintiffs brought five claims against the State Defendants concerning the DEIA Rules (including the Implementation Guidelines) and five parallel claims against the District Defendants for imposing the DEIA Rules (including the Implementation Guidelines) through the Faculty Contract. Plaintiffs argue that the DEIA Rules: (1) mandate and prohibit speech based on viewpoint (Count I & II); (2) unconstitutionally compel speech (Counts III & IV); (3) impose an unlawful prior restraint (Counts V & VI); (4) are impermissibly overbroad (Counts VII & VIII); and (5) are unconstitutionally vague (Counts IX and X).

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction because they have established (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013). The Ninth Circuit balances each element "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Consequently, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction," assuming the Plaintiff also shows a likelihood of irreparable harm, and that the injunction is in the public interest. *Id.* at 1132.

## I.   Plaintiffs Are Likely to Succeed on the Merits of Their First and Fourteenth Amendment Challenges.

Plaintiffs are likely to succeed on each of their claims. Plaintiffs bear the burden of proof of "making a colorable First Amendment claim," but then "the burden shifts to the government to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

The DEIA Rules and Faculty Contract discriminate based on viewpoint and compel professors to teach and preach the State's DEIA dogma. And the DEIA Rules and Faculty

10

Contract cannot survive the demands of strict scrutiny. They also impose an impermissible prior restraint and Plaintiffs' interest in expression far outweighs Defendants' interest in censoring their speech expression. Furthermore, the DEIA Rules and Faculty Contract are overbroad, and unconstitutionally vague.

### A.    The First Amendment Protects Plaintiffs' Academic Freedom.

The DEIA Rules and Faculty Contract violate Plaintiffs' academic freedom and the First Amendment. The "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American" colleges and universities. *Keyishian*, 385 U.S. at 603. Indeed, "safeguarding academic freedom . . . is of transcendent value." *Id.* As a result, the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* Public colleges and universities "do not have a license to act as classroom thought police." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021).

The First Amendment protects the right of faculty members to teach diverse viewpoints in the classroom and of students to be exposed to diverse opinions. *Demers*, 746 F.3d at 406 (concluding that the First Amendment protects "speech related to scholarship and teaching"); *see also Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 674 (6th Cir. 2001) (holding that a community college instructor's use of profanity and racial slurs in a discussion on the use of language in a communications class was protected by the First Amendment).

"The Constitution embraces . . . a heated exchange of views, even (perhaps especially) when they concern sensitive topics like race, where the risk of conflict and insult is high." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). The First Amendment protects teaching and presenting viewpoints that, "however repugnant," are "germane to the classroom subject matter." *Hardy,* 260 F.3d at 683; *Rodriguez*, 605 F.3d at 708 ("The right to provoke, offend and shock lies at the core of the First Amendment."). Students likewise must have "wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603. Accordingly, the government may not "force professors to avoid controversial

viewpoints," *Meriwether*, 992 F.3d at 507, nor "impose [their] own orthodoxy of viewpoint about the content . . . allowed within university classrooms." *Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*, No. 4:22CV304-MW/MAF, 2022 WL 16985720, at *37 (N.D. Fla. Nov. 17, 2022).

### B.   The DEIA Rules And Faculty Contract Are Viewpoint Based and Cannot Satisfy Strict Scrutiny.

The DEIA Rules and Faculty Contract unconstitutionally discriminate based on viewpoint. Verif. Compl. ¶¶ 181–208 (Counts I & II). Government policies that discriminate between viewpoints are a "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring). Viewpoint discrimination is an "egregious form of content discrimination" that is a particularly "blatant" First Amendment violation. *Rosenberger*, 515 U.S. at 829. The Constitution "does not permit the official suppression of ideas." *Bd. of Educ. v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality opinion); *accord id.* at 882 (Blackmun, J., concurring) (concluding that schools could not engage in "an intentional attempt to shield students from certain ideas that officials find politically distasteful"). Accordingly, rules discriminating between viewpoints are presumptively unconstitutional and subject to the most rigorous scrutiny. *Rosenberger*, 515 U.S. at 828.

The DEIA Rules and Faculty Contract discriminate based on viewpoint by requiring faculty to endorse the government's views on DEIA. Professors do not have a choice. They must affirm a "race-conscious and intersectional" viewpoint in their lessons and course materials, even if they strongly support a "color blind" approach as Plaintiffs do. Verif. Compl. ¶¶ 30, 106, 151. They must adjust their language "from a colonized mindset to an equity mindset." *Id.* ¶ 68. And they must "shift to a collectivism perspective" instead of an "individualist perspective." *Id.* ¶ 69. But this governmental "thought police" in the classroom is unconstitutional. *Meriwether*, 992 F.3d at 507.

Forcing professors to embrace concepts like "anti-racism" and "intersectionality"—ideas hotly debated in academia and among the general public—is no different than requiring professors embrace a free-market or Marxist economic perspective, or champion an isolationist or interventionist stance in foreign policy. *Keyishian*, 385 U.S. at 603 (the First Amendment "does

1    not tolerate laws that cast a pall of orthodoxy over the classroom"). The First Amendment does

2    not allow the government to "act as classroom thought police" and pick and choose which

3    opinions professors must air. *Meriwether*, 992 F.3d at 507.

4          The DEIA Rules and Faculty Contract don't just tell professors what they *have* to say,

5    they also govern what professors *cannot* say. Professors must avoid material contradicting the

6    government's viewpoint, lest they inflict "curricular trauma." Professors therefore cannot present

7    arguments or assign materials promoting a contrary "lens" like "color-blindness" rather than

8    "race consciousness" or "equality" rather than "equity." But "[g]iving offense is a viewpoint" and

9    the government cannot impose censorship to avoid offense even if it uses the hyperbolic label of

10   "curricular trauma." *Matal v. Tam*, 582 U.S. 218, 243 (2017); *Rodriguez*, 605 F.3d at 708 ("[I]t is

11   axiomatic that the government may not silence speech because the ideas it promotes are thought

12   to be offensive.").[3]

13         The DEIA Rules and the Faculty Contract are the mirror image of the recently enjoined

14   Stop WOKE Act in Florida. *Pernell*, 2022 WL 16985720, at *37. Florida banned professors from

15   teaching viewpoints that DEIA Rules mandate. For instance, a professor *could not* teach the view

16   that "merit" or "colorblindness" are racist, while the DEIA Rules *force* professors to embrace this

17   exact viewpoint. *See* Verif. Compl. ¶¶ 77–79, Ex. E. The court ruled that Florida "cannot impose

18   its own orthodoxy of viewpoint about the content it allowed within university classrooms."

19   *Pernell*, 2022 WL 16985720, at *37. So too here. California cannot require professors to espouse

20   the views Florida tried to ban. When a state tries to impose ideological uniformity on either side

21   of an issue, the First Amendment steps in.

22         Because the DEIA Rules and Faculty Contract discriminate against certain viewpoints,

23   they must survive strict scrutiny. *Matal*, 582 U.S. at 246 (explaining that viewpoint

24   discrimination triggers strict scrutiny because it "strikes at the heart of the First Amendment");

25
26   _____

[3] It is a longstanding and common refrain in United States political culture to label offensive protected
speech as "violence." *See* Suzanne Nossel, *No, Hateful Speech is Not the Same Things as Violence*, Wash.
Post (June 22, 2017), https://www.washingtonpost.com/outlook/no-hateful-speech-is-not-the-same-thing-
as-violence/2017/06/22/63c2c07a-5137-11e7-be25-3a519335381c_story.html [https://perma.cc/WZQ4-
9DBZ]. That is precisely what the Defendants have done by suggesting that protected expression causes
"curricular trauma."

27

28

1    *Waln v. Dysart Sch. Dist*., 54 F.4th 1152, 1163 (9th Cir. 2022) (recognizing that viewpoint-based

2    speech restrictions are subject to strict scrutiny). Strict scrutiny is a "stringent standard" that

3    "reflects the fundamental principle that governments have no power to restrict expression because

4    of its message, its ideas, its subject matter, or its content." *NIFLA v. Becerra*, 138 S. Ct. 2361,

5    2371 (2018) (quotation marks omitted). Defendants bear the burden of proving the DEIA Rules

6    and Faculty Contract are "narrowly tailored to serve compelling state interests." *Id.*

7         The DEIA Rules and Faculty Contract fail strict scrutiny. Defendants lack a compelling

8    interest in mandating ideological conformity on a contentious policy issue, no matter how noble

9    or enlightened the government perceives its goals to be. Truth on DEIA and every issue must be

10   learned from study, debate, and discussion, not imposed by government fiat. Their interest in

11   "more equitable outcomes" for students, Verif. Compl. Ex. C, cannot justify overt viewpoint

12   discrimination because the Supreme Court has held that any policy designed to remedy unequal

13   racial outcomes or "societal discrimination" rather than concrete instances of racial discrimination

14   is "discrimination for its own sake" and does not further a compelling interest. *Regents of the*

15   *Univ. of Cal. v. Bakke,* 438 U.S. 265, 307 (1978); *Matal*, 582 U.S. at 243. Nor can the "desire to

16   protect the listener" from "curricular trauma" "be convincingly trumpeted as a basis for censoring

17   speech for university students." *McCauley v. Univ of the V.I.*, 618 F.3d 232, 248–49 (3d Cir.

18   2010) (striking down a university speech policy that barred "offensive" signs on campus).

19   California's community colleges betray their mission as "one of the vital centers for the Nation's

20   intellectual life" by shutting down debate and discussion on matters of public concern.

21   *Rosenberger*, 515 U.S. at 836 ("For the University, by regulation, to cast disapproval on

22   particular viewpoints of its students risks the suppression of free speech and creative inquiry in

23   one of the vital centers for the Nation's intellectual life."); *see also Papish v. Bd. of Curators of*

24   *the Univ. of Mo*., 410 U.S. 667, 670 (1973) (holding that campus speech may not be silenced

25   based on "conventions of decency").

26        The DEIA Rules are not narrowly tailored because they are not the least restrictive means

27   of satisfying any state interest in the inclusion and fair treatment of students. California can

28   further its interest in diversity and inclusion in ways that keep academic freedom intact. *Long*

14

1    *Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009)

2    (explaining that a law fails narrow tailoring when there are "obvious alternatives that would

3    achieve the same objectives with less restriction of speech"). The government might provide

4    programs and support to help minority students feel welcome, for example, or encourage other

5    efforts at inclusivity. It may also share its DEIA viewpoints directly with student without forcing

6    professors to act as intermediaries. *NIFLA*, 138 S. Ct. at 2376 (finding that strict scrutiny was not

7    satisfied because the government could itself conduct "a public-information campaign").  But as

8    with Florida's Stop WOKE Act, "a viewpoint-discriminatory ban targeting protected in-class

9    speech" is "certainly *not* reasonable," let alone the least restrictive means of addressing racial

10    inequity or discrimination. *Pernell*, 2022 WL 16985720, at *38. The DEIA Rules and Faculty

11    Contract fail strict scrutiny and violate the First Amendment.

12         **C.**      **The DEIA Rules and Faculty Contract Unlawfully Compel Speech.**

13        The DEIA Rules and Faculty Contract violate the First Amendment because they compel

14    Plaintiffs to speak the government's preferred message. Verif. Compl. ¶¶ 209–235 (Counts III &

15    IV). "If there is any fixed star in our constitutional constellation, it is that no official, high or

16    petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of

17    opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v.*

18    *Barnette*, 319 U.S. 624, 642 (1943). The government "may not compel affirmance of a belief with

19    which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,* 515

20    U.S. 557, 573 (1995). Compelled speech laws are particularly pernicious because they "[f]orc[e]

21    free and independent individuals to endorse ideas they find objectionable" and "coerce[] [them]

22    into betraying their convictions." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council*

23    *31*, 138 S. Ct. 2448, 2464 (2018). Laws compelling speech are subject to strict scrutiny because

24    they "plainly alte[r] the content of . . . speech." *NIFLA*, 138 S. Ct. at 2371. Indeed, "involuntary

25    affirmation could be commanded only on even more immediate and urgent grounds than silence."

26    *Barnette*, 319 U.S. at 633.

27        The DEIA Rules and Faculty Contract echo the unconstitutional loyalty oaths of the

28

1   McCarthy era by requiring faculty to "demonstrate" their commitment to the government's views

2   on DEIA. Plaintiffs must endorse the government's views related to race, gender, or other identity

3   characteristics.[4] Loyalty oaths were unlawful then, *Keyishian*, 385 U.S. at 603, and remain

4   unlawful now. *Cole v. Richardson*, 405 U.S. 676, 680 (1972) (listing cases declaring that

5   governments may not "condition employment on taking oaths that impinge on rights guaranteed

6   by the First and Fourteenth Amendments"). "[C]onditioning [employment] on political belief and

7   association plainly constitutes an unconstitutional condition, unless the government has a vital

8   interest in doing so." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990). This is especially

9   true in higher education because "[t]he vigilant protection of constitutional freedoms is nowhere

10  more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487

11  (1960) (striking down a law requiring teachers to provide the names and addresses of

12  organizations to which they had belonged). The DEIA Rules and the Faculty Contract compel

13  Plaintiffs to endorse the government's viewpoint on disputed concepts like "anti-racism" and

14  "intersectionality" in order to protect their jobs. Indeed, the DEIA Rules and the Faculty Contract

15  dictate not only what Plaintiffs may say, but how they must say it, requiring them to use language

16  consistent with "an equity mindset" and a "collectivism perspective."

17      In short, Plaintiffs are unconstitutionally compelled to promote contested theories and

18  viewpoints in the classroom. Requiring Plaintiffs to do so necessarily "alter[s] the content of their

19  speech." *NIFLA*, 138 S. Ct. at 2371. For Plaintiffs Palsgaard, Druley, Stannard, and Richardson,

20  being required to affirmatively endorse and advance the State's views on DEIA would materially

21  alter the nature of their classroom from one where free inquiry, debate, and discussion are

22  encouraged and welcome, to one where students are indoctrinated rather than taught to think for

23  themselves. Verif. Compl. ¶¶ 98–149. And Plaintiffs Blanken and de Morales are forced to teach

24

25      [4] California's colleges and universities played an ignominious role in the effort to suppress academic freedom in the name of anti-communist zeal. The University of California in 1949 enacted a loyalty oath that all faculty and staff were required to sign. 39 Professors and 84 other staff refused to sign and were

26  dismissed. As a result, around 55 courses were canceled, and 47 scholars declined UC appointments. John S. Cargozian, *The University of Califronia's Loyalty Oath Fight*, Cal. Sup. Ct. Hist. Society (March 10,

27  2023), https://www.cschs.org/wp-content/uploads/2023/03/History-Resources-Caragozian-UCs-Loyalty-Oath-Fight-3-10-23.pdf [https://perma.cc/GL4V-KLHA]. Plaintiffs seek to enjoin the DEIA Rules and the

28  Faculty Contract in order to stop history from repeating itself.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   these viewpoints even though in their professional pedagogical judgment raising these viewpoints

2   are inappropriate in the Chemistry classroom and detracts from the teaching of Chemistry. Verif.

3   Compl. ¶¶ 150–73. It is irrelevant "whether the government seeks to compel a person to speak its

4   message when he would prefer to remain silent or to force an individual to include other ideas

5   with his own speech that he would prefer not to include. All that offends the First Amendment

6   just the same." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (internal citations

7   omitted).

8          Plaintiffs are also compelled to endorse concepts running against their deeply held

9   philosophical, moral, and religious beliefs. For instance, Professor Druley has signed a "pro-

10   human pledge" expressing his commitment to "treat everyone equally without regard to skin color

11   or immutable characteristic." Verif. Compl. ¶ 105. But this runs contrary to the DEIA Rules'

12   requirement that he "promote[] a race-conscious and intersectional lens" in his classroom.

13   Plaintiffs are either forced to "endorse ideas they find objectionable" and "betray[] their

14   convictions," *Janus*, 138 S. Ct. at 2464, or risk being disciplined and even fired for their

15   unwillingness to comply with the DEIA Rules and Faculty Contract.

16          Plaintiffs are expected to endorse the government's DEIA views outside the classroom too

17   by "participating in DEI groups, committees, or community activities that promote systemic and

18   cultural change to close equity gap and support minoritized groups." Verif. Compl. ¶ 64.

19   Plaintiffs are therefore compelled to associate with DEIA advocacy groups in order to promote a

20   viewpoint that they are adamantly opposed to, a textbook violation of First Amendment rights.

21   *See Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 12 (1986) ("[F]orced

22   associations that burden protected speech are impermissible"); *see also Roberts v. U.S.

23   Jaycees,* 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom

24   not to associate.").

25          Because the DEIA Rules and the Faculty Contract compel speech, they are subject to strict

26   scrutiny. They fail strict scrutiny for the reasons explained above. *See supra* Section II.B. The

27   State cannot compel professors to be its DEIA mouthpieces.

28

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### D.    The DEIA Rules and Faculty Contract Impose an Unlawful Prior Restraint on Professors.

The DEIA Rules and Faculty Contract impose an unlawful prior restraint on employee (faculty) expression. Verif. Compl. ¶¶ 236–67 (Counts V & VI). Professors' teaching and academic writing is protected by the First Amendment. *Demers*, 746 F.3d at 412. In *United States v. National Treasury Employees Union* ("*NTEU*"), the Supreme Court distinguished between "a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities . . . [and an analysis of a] wholesale deterrent to a broad category of expression by a massive number of potential speakers." 513 U.S. 454, 467 (1995); *accord Janus*, 138 S. Ct. at 2472 (noting that the *NTEU* test applies to policies that broadly impact employee speech). The latter constitutes a "prior restraint." *Barone v. City of Springfield, Or.*, 902 F.3d 1091, 1105 (9th Cir. 2018). A prior restraint on employee speech "chills potential speech before it happens" and therefore the government "must shoulder a heavier burden" to justify its existence. *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017).

Under this heavier burden, a public employer must "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 455 (quoting *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205*, 391 U.S. 563, 571 (1968)); *Progressive Democrats for Soc. Just. v. Bonta*, 73 F.4th 1118, 1123 (9th Cir. 2023). To meet this "heavy" burden, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (internal quotation marks omitted).

The DEIA Rules and Faculty Contract apply broadly, compelling professors to embrace the proscribed orthodoxy and prohibiting constitutionally protected speech of all professors across the California Community Colleges and State Center Community College District. They apply to all faculty regardless of discipline or pedagogical experience, student preference, and departmental pedagogical judgment. The DEIA Rules and the Faculty Contract are therefore

1    subject to *NTEU*'s stricter standard.

2            Under *NTEU*, the Defendants cannot meet their "heavy burden" because allowing

3    professors to freely express themselves in the classroom does not cause "real" harm. Defendants

4    cannot show that debating diverse ideas in classroom has more than a conjectural negative impact

5    on the operation of the community colleges. Defendants may argue that they will be able to

6    promote their DEIA viewpoints more effectively if they silence less tolerant views. However,

7    "efficiency grounded in the avoidance of accountability is not, in a democracy, a supervening

8    value." *Moonin*, 868 F.3d at 866. In a democracy, truth is advanced through vigorous debate, not

9    the suppression of competing views. America's interest in free inquiry and debate on campus

10   vastly outweighs any purported harm. Indeed, the Supreme Court has warned that if teachers and

11   students are not "free to inquire, to study and to evaluate, to gain new maturity and

12   understanding," then "our civilization will stagnate and die." *Sweezy*, 354 U.S. at 250; *see also*

13   *Rodriguez*, 605 F.3d at 708 (warning that colleges "ensure[] that ideas survive because they are

14   correct, not because they are popular," and "that role in our society will not survive if certain

15   points of view may be declared beyond the pale"). Banning protected expression in the classroom

16   also fails to "alleviate" any negative DEIA impact "in a direct and material way." *NTEU*, 513

17   U.S. at 475. Stifling viewpoint diversity in the classroom does not directly and materially address

18   the lack of racial diversity or unequal educational outcomes for minority groups, it merely

19   silences discussion about how to best address those problems. The DEIA Rules and Faculty

20   Contract impose an unconstitutional prior restraint on academic speech and should be enjoined.

21            **E.    The DEIA Rules and Faculty Contract Are Substantially Overbroad.**

22            The DEIA Rules and the Faculty Contract language are unconstitutional because they are

23   substantially overbroad. Verif. Compl. ¶¶ 268–93 (Counts VII & VIII). A policy is overbroad

24   when "a substantial number of its applications are unconstitutional, judged in relation to the

25   [rule's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Here, the

26   DEIA Rules and Faculty Contract prohibit a sweeping amount of protected speech related to

27   teaching and classroom speech over matters of public concern with a negligible, if not

28

1  nonexistent, legitimate sweep. They likewise lack limiting principles to constrain the application

2  of its censorious terms to speech falling outside First Amendment protection.

3        For instance, faculty must "employ teaching, learning, and professional practices that

4  reflect DEIA and anti-racist principles." But a wide range of protected classroom expression

5  could run contrary to these requirements, such as speech advocating for a colorblind society, or

6  discussing an article critiquing the concepts of "racial equity" or "intersectionality." The DEIA

7  Rules are so overbroad that Plaintiffs Palsgaard and Stannard are refraining from assigning

8  Martin Luther King, Jr.'s *Letter from Birmingham Jail*—a seminal document of the Civil Rights

9  Movement that argues for treating everyone equally regardless of skin color. Verif. Compl.

10  ¶¶ 118, 132. They worry that the letter uses a racial slur and may violate the DEIA Rules by

11  advocating for a "colorblind" rather than "anti-racist" society. *Id.* Indeed, assigning students to

12  debate the Supreme Court's recent decision invalidating affirmative action programs at Harvard

13  and UNC may well run afoul of the DEIA Rules, as well. *Students for Fair Admissions, Inc. v.*

14  *President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023). Yet unless this Court steps in and

15  issues a preliminary injunction, tens of thousands of California faculty face discipline if they dare

16  place it on the syllabus. That is no way to run a public college, and it is incompatible with the

17  First Amendment.

18        The DEIA Rules also require faculty to teach in a manner demonstrating "respect for . . .

19  the diverse backgrounds of students." Verif. Compl. Ex. A § 53605(a). But a variety of protected

20  expression might be accused of not showing "respect for" some backgrounds, such as a history

21  lesson that paints a particular country or religious movement in less-than-flattering light. Indeed,

22  one wonders how a history or international relations professor is expected to teach about conflict

23  in the Middle East. But the First Amendment's protections do not depend on the audience's

24  reaction to the speech. The Supreme Court has consistently held that expression may not be

25  restricted on the basis that others find it disrespectful, offensive, or even hateful. *See, e.g.*, *Papish*,

26  410 U.S. at 667–68; *Snyder v. Phelps*, 562 U.S. 443, 448 (2011); *Matal*, 582 U.S. at 245–46.

27        The *Model Principles* also direct faculty to shift from teaching "from an individualist

28  perspective" to a "collectivism perspective." Verif. Compl. ¶ 69. But many important works of

American literature, philosophy, law, and politics can be said to embody an "individualist

perspective," from the Declaration of Independence to the Bill of Rights to the works of Faulkner

and O'Connor (that Professor Palsgaard has concluded that he can no longer assign to students

because of the DEIA Rules, *id.* ¶ 119*).* If a community college professor favorably discusses the

perspectives of any of these works, they may be accused of embracing an "individualist

perspective" even though the works are in the heartland of First Amendment protection.

The "legitimate sweep" of the DEIA Rules is small to non-existent. Very little speech

barred by the DEIA Rules falls into the "well-defined and narrowly limited classes of speech"

outside the protections of the First Amendment, such as true threats, or severe and pervasive

harassment. *Stevens*, 559 U.S. at 468–69. Nor can California justify their restriction based on a

concern that faculty members would "discredit" or undermine the State's preferred viewpoint by

advancing contrary viewpoints. *Hernandez v. City of Phoenix*, 43 F.4th 966, 981 (9th Cir. 2022)

(finding that a policy that allowed for punishing employees whose speech would "embarrass" or

discredit" a government agency was unconstitutionally overbroad); *Barone*, 902 F.3d at 1103

(striking down a bar on "disparaging or negative speech"). The DEIA Rules and the Faculty

Contract sweep in a substantial amount of protected expression compared to a negligible

legitimate sweep and should be enjoined.

**F.     The DEIA Rules and Faculty Contract Are Unconstitutionally Vague.**

The DEIA Rules and Faculty Contract are unconstitutionally vague. Verif. Compl.

¶¶ 294–322 (Counts IX & X). Government regulations violate the first and First and Fourteenth

Amendments when they "fail[] to provide a person of ordinary intelligence fair notice of what is

prohibited," and "[are] so standardless that [they] authorize[] or encourage[] seriously

discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *Grayned v.

City of Rockford*, 408 U.S. 104, 108 (1972). Vagueness is especially problematic in laws

regulating speech due to the "obvious" potential for a "chilling effect on free speech." *Reno v.

ACLU*, 521 U.S. 844, 871–72 (1997). Speech restrictive laws must be drafted with "narrow

specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *Cohen v. San Bernadino Valley Coll.*,

21

1   92 F.3d 968, 972 (9th Cir. 1996).

2          The DEIA Rules and Faculty Contract fail both tests. They fail to provide sufficient notice

3   to community college professors about what they are and are not allowed to teach. Ideologically

4   loaded terms with abstract requirements like using "a race-conscious and intersectional lens" and

5   staying "anti-racist" does not give professors adequate guidance to know whether their instruction

6   will satisfy the DEIA Rules' requirements. Indeed, many of the key terms in the DEIA Rules like

7   "colonized mindset," "collectivism perspective," "individualist perspective" and "curricular

8   trauma" are left to the imagination of the reader. That is well short of the specificity and precision

9   the Bill of Rights requires.

10          The *Glossary* provides definitions for some DEIA terms. However, these definitions are

11   frequently confusing, circular, and raise more questions than they answer. For instance, the

12   *Glossary* defines "equity minded" as "being (1) race conscious, (2) institutionally focused,

13   (3) evidence based, (4) systematically aware, and (5) action oriented." Defining a vague term with

14   other vague terms makes it vaguer, not less. For instance, what does it mean for a professor to be

15   "systematically aware"? The Rules do not say. And what kinds of evidence qualify as "evidence

16   based" for this definition? What if other scholars disagree? Who gets to decide and based on what

17   criteria? The law mandates the regulator, not the regulated, answer these questions.

18          Similarly, the DEIA Rules warn faculty not to "weaponize academic freedom and

19   academic integrity" to "inflict curricular trauma on our students." Verif. Compl. Ex. D. The

20   *Glossary* does not define "curricular trauma." Has a professor inflicted "curricular trauma" if a

21   student is upset by a movie or perspective? Indeed, many books, articles or films that challenge a

22   reader's ingrained perspective or worldview could be accused of inflicting "curricular trauma,"

23   such as the video about the war on drugs that Professor Palsgaard wishes to show or the *New York

24   Times* op-ed that Professor Stannard has his students read and discuss. Verif. Compl. ¶¶ 120, 131.

25          Despite the rampant vagueness, Plaintiffs are expected to immediately begin

26   implementing these requirements into the classroom and will be evaluated on implementation. As

27   a result, Plaintiffs will feel pressure to self-censor and "steer far wider of the [prohibited] zone,"

28   *Grayned*, 408 U.S. at 109, resulting in a serious chilling effect on their academic speech, an

1   intolerable result under the First Amendment.

2           The DEIA Rules likewise invite arbitrary and discriminatory enforcement if a professor

3   assigns material out of alignment with the government's DEIA views. This is particularly the case

4   if an evaluator and professor disagree about whether a lesson is culturally affirming or promotes

5   equity. After all, "[p]eople often label as [racist] ideas which they oppose." *Elfbrandt v. Russell,*

6   384 U.S. 11, 16 (1966) (striking down an anti-communist loyalty oath that could penalize

7   professors for participating in disfavored conferences or seminars). The DEIA Rules and the

8   Faculty Contract fall short of the "greater precision and specificity" required when First

9   Amendment rights are implicated and violate due process requirements. *Adamian v. Jacobsen,*

10  523 F.2d 929, 932 (9th Cir. 1975).

11  **II.     Plaintiffs Satisfy the Remaining Requirements for a Preliminary Injunction.**

12          Plaintiffs satisfy the remaining preliminary injunction factors: They will suffer irreparable

13  harm if the DEIA Rules are not enjoined; the balance of equities tips in Plaintiffs' favor; and an

14  injunction is in the public interest. *Winter*, 555 U.S. at 20.

15          **A.     Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction.**

16          The DEIA Rules' disregard of Plaintiffs First Amendment rights will cause them

17  irreparable harm. The Supreme Court squarely held that "the loss of First Amendment freedoms,

18  for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,*

19  427 U.S. 347, 373 (1976). Thus, "irreparable harm is relatively easy to establish in a First

20  Amendment case." *CTIA – The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 851 (9th

21  Cir. 2019). Plaintiffs need only present "evidence of an ongoing constitutional violation." *Riley's*

22  *Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022); *see also CTIA*, 928 F.3d at

23  851 ("[A] party seeking preliminary injunctive relief in a First Amendment context can establish

24  irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim.")

25  (internal citations omitted). Because the DEIA Rules and associated provisions in the Faculty

26  Contract infringe Plaintiffs' First Amendment freedoms as explained in section II, *supra*,

27  Plaintiffs have demonstrated irreparable harm.

28

**B.    The Balance of Equities and Public Interest Favor a Preliminary Injunction.**

An injunction is also in the public interest. Because the government is a party, the "balance of equities" and "public interest" elements merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Both factors favor Plaintiffs. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (citing *Doe*, 772 F.3d at 583); *see also Riley's Am. Heritage Farms*, 32 F.4th at 731 ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

Plaintiffs' interest in enjoining the DEIA Rules is significant and outweighs Defendants' interest in enforcement. While California has no legitimate interest in requiring professors to profess allegiance to a particular view on matters of public concern to maintain and advance their careers, Plaintiffs' interest in preserving their First Amendment rights to teach and speak freely is significant. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019) (holding that a chilling effect on a plaintiff's free speech rights favors the grant of a preliminary injunction) (citing *Doe v. Harrison*, 772 F.3d at 583). The public too has an overwhelming interest in preserving colleges and universities as spaces for free inquiry and open debate. "[A]cademic freedom . . . is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603.

**C.    Plaintiffs Should Not Be Required to Provide a Security Bond on the Preliminary Injunction.**

Plaintiffs respectfully request that the Court not require a bond under Federal Rule of Civil Procedure 65(c). "'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003)). The Court "may dispense with the filing of a bond" in this case because "[t]here is no realistic likelihood that Defendants will be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment on its face." *United Food and Com. Workers Loc. 99 v. Brewer*,

24

1   817 F. Supp. 2d 1118, 1128 (D. Ariz. 2011) (declining to require a bond when granting a

2   preliminary injunction on First Amendment Grounds) (citing *Jorgensen,* 320 F.3d at 919).

3                                          **CONCLUSION**

4

5           For the foregoing reasons, this Court should grant Plaintiffs' Motion for Preliminary

6   Injunction.

7

8   Dated: August 23, 2023

9

10  Respectfully submitted,

11          /s/ Daniel M. Ortner
            DANIEL M. ORTNER (California State Bar No. 329866)
12          daniel.ortner@thefire.org
13          FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
            510 Walnut Street, Suite 1250
14          Philadelphia, PA 19106
            Telephone: (215) 717-3473
15

16          *Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION