1
2
3
4
5
6
7

8 **UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 LOREN PALSGAARD, et al.,                No. 1:23-cv-01228-KES-CDB

12         Plaintiffs,                     **ORDER GRANTING DEFENDANTS'
                                           MOTIONS TO DISMISS FOR LACK OF
13     v.                                  STANDING, AND DENYING
                                           PLAINTIFFS' MOTION FOR
14 SONYA CHRISTIAN, et al.,                PRELIMINARY INJUNCTION AS MOOT**

15         Defendants.                     Docs. 13, 35, 42, 43

16

17         Plaintiffs Loren Palsgaard, David Richardson, Bill Blanken, and Linda de Morales

18 ("Plaintiffs) bring a pre-enforcement challenge seeking injunctive and declaratory relief to

19 preclude the State Chancellor and members of the Board of Governors of the California

20 Community Colleges from enforcing various provisions of the California Code of Regulations

21 concerning Diversity, Equity, Inclusion and Accessibility ("DEIA") provisions, and to preclude

22 officials of the State Center Community College District ("SCCCD") from enforcing certain

23 provisions of the union Faculty Contract concerning Plaintiffs' employment that reference DEIA

24 matters.[1]  Because Plaintiffs lack standing to bring their claims, Defendants' motions to dismiss

25 are granted and the complaint is dismissed without prejudice.

26

27 _____
[1] Plaintiffs are professors at SCCCD campuses.  Former Plaintiffs Michael Stannard and James
   Druley filed notices of voluntary dismissal of their claims on July 26, 2024, and October 31,
28 2024, respectively.  Docs. 56, 64.

1    **I.        Introduction & Procedural History**

2        On August 17, 2023, Plaintiffs filed this action against Defendants Sonya Christian, Amy

3    M. Costa, Hildegarde B. Aguinaldo, Darius W. Anderson, Adrienne C. Brown, Tom Epstein,

4    Felicia Escobar Carillo, Jolena M. Grande, Pamela Haynes, Eleni Kounalakis, Harry Le Grande,

5    Paul Medina, Jennifer L. Perry, Bill Rawlings, Mary H. Salas, Blas Villalobos, and Joseph R.

6    Williams (the "State Defendants"), in their official capacities with California Community

7    Colleges, [2] and Defendants Carole Goldsmith, Nasreen Johnson, Magdalena Gomez, Danielle

8    Parra, Richard M. Caglia, Robert A. Fuentes, Deborah J. Ikeda, and Destiny Rodriguez (the

9    "District Defendants"), in their official capacities with SCCCD.[3]  Doc. 1 ("Compl.").

10        In their complaint, Plaintiffs seek declaratory relief that the sections of title 5 of the

11    California Code of Regulations that were added or amended in March 2023 concerning DEIA

12    matters, and provisions of the Faculty Contract addressing DEIA matters, are facially

13    unconstitutional under the First and Fourteenth Amendments.[4]  Compl. Prayer for Relief (a)-(b).

14    The complaint further requests that the State Defendants be enjoined from enforcing the relevant

15    sections of the California Code of Regulations, and that the District Defendants be enjoined from

16    enforcing the provisions of the Faculty Contract concerning DEIA matters.  Compl. Prayer for

17    Relief (c)-(d).  On August 23, 2023, Plaintiffs filed a motion for preliminary injunction.  Doc. 13.

18    On September 13, 2023, the State Defendants and the District Defendants filed oppositions to the

19    motions (Docs. 24, 25), to which Plaintiffs replied (Doc. 29).  On December 15, 2023, the State

20    Defendants moved to dismiss the complaint against them for lack of standing and for failure to

---

21    [2] Defendant Christian is the Chancellor of the California Community Colleges system and the
22    CEO of the Board of Governors.  Compl. ¶ 31.  Defendants Costa, Aguinaldo, Anderson, Brown,
      Epstein, Escobar Carrillo, Grande, Haynes, Kounalakis, Le Grande, Medina, Perry, Rawlings,
23    Salas, Villalobos, and Williams are members of the Board of Governors of California Community
      Colleges.  Compl. ¶ 32.
24

25    [3] Defendant Carole Goldsmith is the Chancellor of the State Center Community College District.
      Compl. ¶ 34.  Defendants Nasreen Johnson, Magdalena Gomez, Danielle Parra, Richard M.
26    Caglia, Robert A. Fuentes, Deborah J. Ikeda, Destiny Rodriguez, and Gerardo Reyes are members
      of the Board of Trustees of the State Center Community College District.  Compl. ¶ 35.

27    [4] The added and amended sections at issue are Cal. Code Regs. tit. 5, §§ 52510, 53400, 53401,
28    53403, 53425, 53601, 53602, and 53605.  *See* Compl. Ex. A.

state a claim.  Doc. 42 ("State Defs.' MTD").  The same day, the District Defendants separately moved to dismiss the complaint against them, asserting that Plaintiffs lack standing, that Plaintiffs waived the rights at issue pursuant to their union's bargaining agreement, that Plaintiffs' First Amendment rights are not impermissibly restricted, and that the District Defendants cannot be liable under 42 U.S.C. section 1983 for complying with mandatory state regulations.  Doc. 43 ("Dist. Defs.' MTD").  Plaintiffs responded to both motions to dismiss, Doc. 47 ("Pls.' Opp."), and the State Defendants and the District Defendants separately replied to the opposition (Docs. 49, 50).  The Court granted Plaintiffs' motion for leave to file supplemental briefing.  Docs. 60, 61.  Plaintiffs filed a supplemental brief on October 18, 2024, Doc. 63, to which the State Defendants and District Defendants replied on October 31, 2024, and November 1, 2024, respectively (Docs. 65, 67).  As Plaintiffs lack standing to bring this claim, Defendants' motions to dismiss are granted.  Accordingly, Plaintiffs' motion for preliminary injunction is denied as moot.[5]

## II.    Facts[6]

### A.    Regulatory Scheme

The California Community Colleges system is comprised of seventy-three districts, including SCCCD.  Compl. ¶ 33.  The Board of Governors of the California Community Colleges "sets policy and provides guidance" for its constituent districts.  State Defs.' MTD 9 (citing Cal.

---

[5] Plaintiffs' related request for judicial notice regarding their motion for preliminary injunction, Doc. 35, is therefore likewise denied as moot.

[6] The recitation of facts is taken mostly from Plaintiffs' complaint.  A Rule 12(b)(1) attack on subject matter jurisdiction may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.*  "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*  In a factual attack on jurisdiction under Rule 12(b)(1) regarding standing, "the district court may review evidence beyond the complaint" to resolve the factual dispute and resolve the jurisdictional question. *Id.* at 1039.  Defendants' standing arguments are largely raise a facial challenge based on the allegations in the complaint and documents attached thereto, including the Faculty Contract attached as Exhibit F to the complaint.  To the extent parties point to certain additional documents outside the complaint relevant to standing, the Court also considers those below for purposes of the standing analysis.

1   Educ. Code § 70900).  "[T]he Board [of Governor]'s primary purpose is to provide 'leadership

2   and direction' while maintaining, 'to the maximum degree permissible, local authority and

3   control in the administration' of local community colleges by their districts."  *Id.* at 11 (quoting

4   Cal. Educ. Code § 70901(a)).

5         In March 2023, the Board of Governors amended title 5 of the California Code of

6   Regulations to require districts to develop and include DEIA standards in the evaluation and

7   tenure review of district employees.  *See* Compl. ¶ 46 & Ex. A, at 3.  The regulations became

8   effective on April 26, 2023.  *See* Compl. ¶ 47 n.1.

9         Section 53400 provides that "[t]his subchapter implements provisions of the [California]

10  Education Code that govern the minimum qualifications for employment in a community college

11  district."  Cal. Code. Regs. tit. 5, § 53400.  Section 53425 states that "all district employees shall

12  demonstrate the ability to work with and serve individuals within a diverse community college

13  campus environment as required by local policies regarding DEIA competencies."  *Id.* § 53425.[7]

14  The regulations do not mandate what such "local policies regarding DEIA competencies" must

15  include.

16        Section 53601 provides that "[t]he Chancellor shall adopt and publish guidance describing

17  DEIA competencies and criteria."  *Id.* § 53601(a).  It also states that "[t]he DEIA competencies

18  and criteria identified by the Chancellor shall be used as a reference for locally developed

19  minimum standards in community college district performance evaluations of employees and

20  faculty tenure reviews."  *Id.* § 53601(b).

21        Section 53602 requires that "[d]istrict governing boards shall adopt policies for the

22  evaluation of employee performance, including tenure reviews, that requires demonstrated, or

23

24  [7] Section 52510 consists of definitions that apply to the chapter.  Cal. Code. Regs. tit. 5, § 52510.
    Notably, it provides that "anti-racism" and "anti-racist" refer "to policies and actions that lead to
25  racial equity;" that "competencies" refer "to skills, knowledge, abilities, and behaviors all
    employees must demonstrate and utilize in interactions with students and colleagues, and the
26  performance of their job duties;" that "criteria" refer "to the elements used in employee
    evaluation and tenure review processes to measure performance;" and that "evaluation" refers to
27  "a tool to provide and receive constructive feedback to promote professional growth and
    development."  *Id.* § 52510(d), (f)-(g), (l).
28

progress toward, proficiency in the locally-developed DEIA competencies or those published by the Chancellor pursuant to section 53601." *Id.* § 53602(a).  It further provides that "[d]istrict employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges" and "[t]he evaluation of district employees must include consideration of an employee's demonstrated, or progress toward, proficiency in diversity, equity, inclusion, and accessibility DEIA-related competencies that enable work with diverse communities, as required by section 53425." *Id.* § 53602(b).

Section 53602(c) mandates districts to "(1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees; (2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria; (3) set clear expectations regarding employee performance related to DEIA principles, appropriately tailored to the employee's classification; (4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes to support employee growth, development, and career advancement; (5) ensure professional development opportunities support employee development of DEIA competencies that contribute to an inclusive campus and classroom culture and equitable student outcomes; (6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies; [and] (7) include proposed or active implementation goals to integrate DEIA principles as a part of the district's Equal Employment Opportunity Plan required by section 53003." *Id.* § 53602(c).

Lastly, section 53605 provides that "[f]aculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion." *Id.* § 53605(a).  It also provides obligations for administrators and staff members.  *Id.* § 53605(b)-(c).[8]

---

[8] Less relevant to Plaintiffs claims, sections 53401, 53402, and 53403 were also amended or added to the Code of Regulations.  Following amendment, section 53401 provides that, though community service classes and certain contract classes are exempt from this subchapter, they are not exempt from the "provisions related to the advancement of diversity, equity, inclusion, and

5

1       **B.    Guidance Documents**

2           Pursuant to section 53601(a), the Chancellor of the Board of Governors adopted and

3   published the Diversity, Equity, and Inclusion Competencies and Criteria Recommendations (the

4   "DEI Recommendations"), *see* Compl. Ex. B, to be used by the districts "as *a reference* for

5   locally developed minimum standards in community college district performance evaluations of

6   employees and faculty tenure reviews."  *See* § 53601(a)-(b) (emphasis added).  The DEI

7   Recommendations set out guidance to the districts.  The DEI Recommendations were not adopted

8   by the formal regulatory process and are not binding on the districts.[9]  The DEI

9   Recommendations indicate that they are to be considered as guidance for the districts.  *See*

10  *generally* Compl. Ex B (describing the DEI Recommendations as a "set of *sample* DEI

11  competencies and criteria," noting that districts "are *strongly recommended* to use these DEI

12  competencies and criteria as a baseline to develop [local] DEI competencies and criteria," stating

13  what the district's local process "*may include*," and providing for every listed theme a

14  "*recommended* description" of that theme) (emphases added).

15          The Chancellor's Office also issued a memorandum entitled "Guidance on

16  Implementation of DEIA Evaluation and Tenure Review Regulations" ("Guidance Memo"), a

17  document entitled "DEI in Curriculum: Model Principles and Practices ("Model Principles"), and

18  a document entitled "Diversity, Equity, Inclusion, and Accessibility Glossary of Terms

19  ("Glossary of Terms").  Compl. ¶ 58 & Exs. C-E.  Like the DEI Recommendations, the Guidance

20  _____

21  accessibility principles."  *Id.* § 53401.  Section 53402 was deleted.  *Id.* § 53402.  Section 53403
    was edited only to move certain language within the section and to change the phrase "he or she"

22  to "they."  The amended section 53403 provides, as before, that notwithstanding changes made to
    the minimum qualifications established, a community college district's governing board may

23  continue to employ a person if they met the minimum qualifications at the time of their hiring.
    *Id.* § 53403.

24

25  [9] *See* State Defs.' MTD 12 & n.1 (citing Cal. Cmty. Colls. Chancellor's Off., Procedures and
    Standing Orders of the Board of Governors 22 (Dec. 2022), https://www.ccccio.edu/-

26  /media/CCCCO-Website/docs/procedures-standing-orders/december-2022-procedures-standing-
    ordersv2-a11y.pdf?la=en&hash=FF692A0AE8ACC8FE6BB2A4D75018302005A8A4D6

27  ("Neither the Board nor the Chancellor may administer or enforce any regulation . . . unless that
    regulation is adopted in accordance with the provisions of this Chapter.").

28

1    Memo, Model Principles, and Glossary of Terms were not adopted pursuant to the formal

2    regulatory process and are not binding on the districts.[10]  Also like the DEI Recommendations,

3    these documents indicate that they are to be considered as guidance for the districts.  *See* Compl.

4    Ex. C (stating "[t]his *guidance* is intended to assist community colleges in achieving these

5    objectives") (emphasis added); Compl. Ex. D (stating that committee that created the Model

6    Principles was charged with "developing *guidance*" and that "[t]he chart *is not exhaustive* and *is*

7    *not intended to be a mandate*, but rather a model and tool") (emphases added); Compl. Ex. E

8    (stating that "purpose of . . . Glossary of Terms is to serve as *a reference guide* of DEI terms")

9    (emphasis added).

10       **C.**      **Faculty Contract**

11       On January 27, 2023, SCCCD and the union representing full-time faculty at SCCCD

12   entered into a three-year agreement for full-time faculty (the "Faculty Contract").  Compl. ¶ 82 &

13   Ex. F.  The Faculty Contract contains evaluation criteria for SCCCD faculty.  Compl. Ex. F, at

14   42-43.  Among other criteria, the Faculty Contract requires that faculty be evaluated in part on

15   their "[d]emonstration of, or progress toward, diversity, equity, inclusion and accessibility

16   (DEIA)-related competencies, and teaching and learning practices that reflect DEIA and anti-

17   racist principles, and reflect knowledge of the intersectionality of social identities, illustrate a

18   developing set of skills for effective cross-cultural teaching, and recognize the myriad of ways in

19   which people differ, including the psychological, physical, cognitive, and social differences that

20   occur among individuals, all to improve equitable student outcomes and course completion."

21   Compl. Ex. F, at 42-43.  As part of the evaluation process, faculty members will submit self-

22   evaluations in which the faculty member must "demonstrate an understanding of diversity, equity,

23   inclusion and accessibility (DEIA) competencies and anti-racist principles, and how they have put

24   those principals [sic] into practice to improve equitable student outcomes and course completion."

25

26   [10] *See* State Defs.' MTD 12 (citing Cal. Cmty. Colls. Chancellor's Off., Procedures and Standing
     Orders of the Board of Governors 22 (Dec. 2022), https://www.ccco.edu/-/media/CCCCO-

27   Website/docs/procedures-standing-orders/december-2022-procedures-standing-ordersv2-
     a11y.pdf?la=en&hash=FF692A0AE8ACC8FE6BB2A4D75018302005A8A4D6).

28

1   Compl. Ex. F, at 41.

2          Finally, the Faculty Contract provides that "[o]nce a training is jointly developed and

3   approved by Human Resources, the Federation and the Academic Senates of all four colleges, a

4   joint team from Human Resources, the Federation and the four Academic Senates will meet with

5   all evaluators and evaluatees during the first two weeks of the Fall or Spring semester to ensure

6   that all have a uniform understanding of the DEIA competencies and criteria, the expectations

7   regarding a [faculty] member's performance related to the competencies and criteria, and best

8   practices on how to assess that during the evaluation process."  Compl. Ex. F, at 46.  Plaintiffs'

9   complaint does not contain any allegations concerning the training developed or provided to

10  faculty.  The record before the Court does not include any description of such training, or of any

11  "uniform understanding of the DEIA competencies and criteria" or "expectations regarding a

12  [faculty] member's performance related to the competencies and criteria" that may have been

13  provided in any such training.

14         Plaintiffs allege that the Faculty Contract "incorporates" the DEI Recommendations,

15  Model Principles, Glossary of Terms, and Guidance Memo issued by the Chancellor's Office

16  (collectively, "guidance documents") and the regulations.  Compl. ¶¶ 5, 83, 198, 224, 257, 283,

17  312; *see also* Doc. 63 at 1.  However, the Faculty Contract, which is attached to the complaint

18  and incorporated therein, does not cite or specifically reference the regulations or the guidance

19  documents.  *See generally* Compl. Ex. F.

20         **D.     Plaintiffs**

21         Plaintiffs are professors at various SCCCD community colleges.  Compl. ¶ 5.  Plaintiffs

22  challenge the constitutionality of the DEIA regulations and the provisions of the Faculty Contract

23  implementing the regulations.  *See generally* Compl.

24         Plaintiff Loren Palsgaard is an English professor at Madera Community College.  Compl.

25  ¶ 117.  Palsgaard fears that "if he discusses controversial issues in DEIA matters or presents

26  competing views on those issues, he will be deemed insufficiently 'anti-racist' or accused of

27  'weaponiz[ing] academic freedom' and 'inflict[ing] curricular trauma' on his students."  Compl.

28

1    ¶ 117.[11]  Specifically, Palsgaard states that he no longer assigns Martin Luther King Jr.'s *Letter*

2    *from Birmingham Jail* or Victor Davis Hanson's *Mexifornia*, because they "offer perspectives that

3    are different from the 'anti-racism' and 'intersectionality' perspective mandated by the DEIA

4    Rules."  Compl. ¶ 118.  He states he no longer assigns works by William Faulkner or Flannery

5    O'Connor because they contain racial slurs.  Compl. ¶ 118.  He fears that assigning students to

6    read works by these authors may be considered "weaponiz[ing] academic freedom" and

7    "inflict[ing] curricular trauma."  Compl. ¶ 119.

8         Palsgaard asserts he is reconsidering continuing to show his students recorded debates

9    regarding the death penalty and "whether the criminal justice system is systemically racist," or

10   regarding the legalization of drugs and "whether the war on drugs resulted in racially inequitable

11   outcomes," because the debates show both sides of the issue and he fears that showing

12   "arguments in favor of the death penalty and against drug legalization" may not be "culturally

13   affirming" and may constitute a failure to "promote[] a race-conscious and intersectional lens."

14   Compl. ¶ 120.  Palsgaard alleges that he "fears he will be disciplined or dismissed from

15   employment for 'unsatisfactory performance' or a 'persistent' or 'willful violation' of the DEIA

16   Rules and the DEIA requirements of the Faculty Contract if he continues to share his criticism of

17   DEIA and anti-racism principles and not affirmatively teach and preach those principles in his

18   classroom."  Compl. ¶ 124.  Finally, he fears his self-evaluation will be considered unacceptable

19   and/or result in a denial of a merit pay increase or discipline, given that he would like to express

20   in that evaluation, as he has done before, his view that there is a need for more exposure to

21   alternate DEIA viewpoints.  Comp. ¶ 123.

22         Plaintiff David Richardson teaches history at Madera Community College and his classes

23   "necessarily involve discussion of topics like discrimination, the Civil Rights Movement, and

24   slavery."  Compl. ¶¶ 139, 141.  Richardson asserts he is now afraid to "encourage[] debates about

---

25   [11] As noted below when addressing whether Plaintiffs intended conduct is arguably proscribed by
26   the regulations or the Faculty Contract, much of the quoted language that Plaintiffs assert
     proscribes their intended conduct derives from the non-binding guidance documents, not the
27   regulations or the Faculty Contract.  For instance, "weaponiz[ing] academic freedom" and
     "inflict[ing] curricular trauma" are terms used in the Model Principles, but these terms are not
28   included in the regulations or in the Faculty Contract.

controversial ideas" as he has always done, due to the new DEIA requirements. Compl. ¶ 142. Richardson fears "he would be accused of 'weaponiz[ing] academic freedom' and 'inflict[ing] curricular trauma'" if he asks students to "examin[e] the contrasting views of Booker T. Washington and W.E.B. Dubois, and Martin Luther King Jr. and Malcolm X." Compl. ¶ 143. Similarly, he is "afraid to teach controversial facts, such as the existence of black plantation owners and slaveholders in the American Antebellum South, because such facts run contrary to the mandated 'race-conscious and intersectional lens,' and may not be seen as 'culturally affirming.'" Compl. ¶ 144. Like Palsgaard, Richardson "fears he will be disciplined or fired for 'unsatisfactory performance' or a 'persistent' or 'willful violation' of the DEIA Rules and the Faculty Contract if he continues to share his criticism of DEIA principles and not affirmatively teach and preach those principles in his classroom." Compl. ¶ 149. Finally, he fears his self-evaluation "will not satisfy the DEIA Rules because he will criticize 'equity,' 'intersectionality' and 'anti-racism,'" and fears he will risk "negative professional repercussions if his viewpoint is labeled a 'racial ideology' that 'perpetuates racial inequalities and denies systematic racism.'" Compl. ¶ 148.

Plaintiff Bill Blanken teaches chemistry at Reedley College. Compl. ¶ 150. He "emphasizes to his students he will treat them equally and will reward those who work hard regardless of their skin color." Compl. ¶ 151. He believes that, pedagogically, "DEIA principles do not have a place in the Chemistry curriculum," as "[t]here is little opportunity to discuss DEIA principles in the ordinary course of teaching Chemistry and Blanken does not want to include DEIA material unrelated to Chemistry because it would necessarily take up time otherwise spent on [C]hemistry." Compl. ¶ 152. He therefore "refuses to do so." Compl. ¶ 156. Furthermore, when he teaches, "he discusses well-known chemists such as Marie Curie and Robert Boyle without mentioning the chemist's race," and he fears that "[b]ecause he focuses on the scientists that have made the greatest impact on the study of Chemistry regardless of ethnicity or country of origin, he fears that if he continues to teach an accurate history, he will be accused of failing to adopt 'culturally responsive practices and a social justice lens.'" Compl. ¶ 153.

Blanken "fears he will face negative professional repercussions under the DEIA Rules and

Faculty Contract if he continues to share his criticism of DEIA and 'anti-racism' principles and does not integrate DEIA principles into his Chemistry classroom in a pedagogically unsound and disruptive manner."  Compl. ¶ 159.  He further fears that he "will be disciplined or fired for 'unsatisfactory performance' or a 'persistent' or 'willful violation' of the DEIA Rules and the DEIA requirements of the Faculty Contract if he continues to share his criticism of DEIA and anti-racism principles, does not integrate DEIA principles into his Chemistry classroom, and does not affirmatively teach and preach those principles in his classroom."  Compl. ¶ 160.  Finally, "Blanken is worried that his self-evaluation will not satisfy the DEIA Rules because he will say that he believes that everyone must be treated equally and in a color-blind manner regardless of race rather than adopting and promoting the race-conscious equity and 'anti-racism' approach required under the DEIA Rules and the Faculty Contract," and he further fears he may risk "negative professional repercussions if evaluators view his ideas as a 'racial ideology' that 'perpetuates racial inequalities and denies systematic racism.'"  Compl. ¶ 158.

Plaintiff Linda de Morales is a chemistry professor at Madera Community College. Compl. ¶ 161.  Like Blanken, she "does not want to include DEIA material in her chemistry courses."  Compl. ¶ 162.  She "tells her students that if they want to earn a good grade they need to earn it," but she "is now concerned that if she emphasizes the importance of 'merit' that she will be accused of [']protect[ing] White Privilege under the guise of standards.'"  Compl. ¶ 163. De Morales alleges she is worried that continuing to show her students the film "Hidden Figures," would "violate the DEIA Rules because it might be viewed as inflicting 'curricular trauma' on her students" because "some accuse [the film] of 'white-washing' history by including a 'white savior' figure."  Compl. ¶¶ 164-65.  She asserts that "[t]he principles of anti-racism embedded in the DEIA Rules violate [her] deeply held moral and religious beliefs regarding the need to treat everyone equally in a color-blind manner," as "[t]he DEIA Rules . . . require [her] to adopt the frameworks of 'anti-racism' and 'intersectionality' which require express race-consciousness." Compl. ¶ 166.

De Morales "worries that her endorsement of color-blindness will be considered a 'racial ideology' that 'perpetuates racial inequalities and denies systematic racism,' as it would be

1     according to the Glossary [of Terms]."  Compl. ¶ 167.  "De Morales fears she will be disciplined

2     or fired for 'unsatisfactory performance' or a 'persistent' or 'willful violation' of the DEIA Rules

3     and the DEIA requirements of the Faculty Contract if she continues to share her criticism of

4     DEIA and 'anti-racism' principles, does not integrate DEIA principles into her Chemistry

5     classroom, and does not affirmatively teach and preach those principles in her classroom."

6     Compl. ¶ 173.  Finally, de Morales "is worried that her self-evaluation will not satisfy the DEIA

7     Rules because she will say that she believes that everyone must be treated equally and in a color-

8     blind manner regardless of race rather than adopting the race-conscious equity and anti-racism

9     approach required under the DEIA Rules and the Faculty Contract," so she also therefore worries

10    that she "will face negative professional repercussions if her viewpoint is labeled a 'racial

11    ideology' that 'perpetuates racial inequalities and denies systematic racism.'"  Compl. ¶ 172.

### III.    <u>Legal Standard</u>

13        The District Defendants and the State Defendants separately move to dismiss the claims in

14    the amended complaint for lack of standing.  The Court has an independent obligation to ensure

15    that standing is established, as "perhaps the most important" jurisdictional doctrine.  *See FW/PBS,*

16    *Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted).  "[S]tanding is not dispensed

17    in gross."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (citing *Lewis v. Casey*, 518 U.S.

18    343, 358, n.6 (1996)).  "[A] plaintiff must demonstrate standing for each claim he seeks to press

19    and for each form of relief that is sought."  *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S.

20    332, 352 (2006)) (cleaned up).  "[E]ach element must be supported in the same way as any other

21    matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

22    evidence required at the successive stages of the litigation."  *Susan B. Anthony List v. Driehaus*,

23    573 U.S. 149, 158 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

24        Before the Court are both a motion for preliminary injunction and Defendants' motions to

25    dismiss.  The legal standard for standing is different in these two contexts.  "At the preliminary

26    injunction stage, the plaintiffs 'must make a clear showing of each element of standing.'"  *L.A.*

27    *All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (quoting *Yazzie v.*

28    *Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020)).  Where there is a motion to dismiss for lack of

1    standing, plaintiffs need not make a "clear showing," but must still establish as an "irreducible

2    constitutional minimum" that they have "(1) suffered an injury in fact, (2) that it is fairly traceable

3    to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable

4    judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at

5    560).  As addressed below, Plaintiffs fail to meet the lower standard for standing on a motion to

6    dismiss, necessitating dismissal of the complaint.

7    **IV.    Discussion and Analysis**

8    Standing is an indispensable part of Plaintiffs' case.  *See, e.g.*, *FW/PBS, Inc.*, 493 U.S. at

9    231.  Plaintiffs must establish standing to avoid dismissal of the complaint.  For the reasons set

10   out below, the Court grants the Defendants' motions to dismiss without prejudice as to all claims,

11   for lack of standing.

12   To establish standing, Plaintiffs must show "injury in fact, causation, and a likelihood that

13   a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775,

14   785 (9th Cir. 2010) (quoting *Lujan*, 504 U.S. at 560-61).  Here, the main disagreement is whether

15   Plaintiffs have adequately alleged injury in fact.

16   "[T]he requirements of ripeness and standing [are applied] less stringently in the context

17   of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citation

18   omitted).[12]  Specifically, one need not await "consummation of threatened injury," but rather may

19   bring pre-enforcement challenges to statutes which arguably infringe upon First Amendment

20   rights in certain circumstances.  *Id.* (citations omitted).  However, the "mere existence of a

21   proscriptive statute" is "insufficient to create a ripe controversy."  *Id.* (citations omitted).  The

22   plaintiff still "must be subject to a genuine threat of imminent prosecution."  *Safer Chemicals,*

23   *Healthy Families v. U.S. Env'l Prot. Agency*, 943 F.3d 397, 414 (9th Cir. 2019) (citation omitted).

24   Therefore, "a[] plaintiff may [not] bring a First Amendment claim 'by nakedly asserting that his

25   or her speech was chilled.'" *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (citing

26

27   _____

     [12] Because "[s]orting out where standing ends and ripeness begins is not an easy task,
     constitutional ripeness is often treated under the rubric of standing because ripeness coincides
     squarely with standing's injury in fact prong."  *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th

28   Cir. 2018) (cleaned up).

1  *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003); *Lopez*, 630 F.3d at

2  787).  To establish injury in fact, a plaintiff must have suffered "an invasion of a legally protected

3  interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

4  hypothetical."  *Clark*, 899 F.3d at 809 (citing *Lujan*, 504 U.S. at 560) (cleaned up).

5       The Ninth Circuit has looked to the following factors to determine whether a plaintiff has

6  sufficiently alleged an injury in fact to bring a pre-enforcement challenge: (1) whether the

7  plaintiff has articulated a concrete plan to violate the law in question, (2) whether the prosecuting

8  authorities have communicated a specific warning or threat to initiate proceedings against the

9  plaintiff, (3) the history of past prosecution or enforcement under the challenged statute, and (4)

10 whether the challenged law is applicable to the plaintiff.  *See, e.g.*, *Unified Data Servs., LLC v.*

11 *Fed. Trade Comm'n*, 39 F.4th at 1210 & n.8 (9th Cir. 2022) (citations omitted); *see also Tingley*

12 *v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).  However, the Ninth Circuit has more recently

13 used the factors set out in *Susan B. Anthony List v. Driehaus*, requiring that (1) the plaintiff allege

14 "an intention to engage in a course of conduct arguably affected with a constitutional interest,"

15 (2) the intended future conduct be "arguably . . . proscribed by [the challenged] statute," and (3)

16 there exist a "credible threat of enforcement."  *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487

17 (9th Cir. 2024) (quoting *Driehaus*, 573 U.S. at 159; *see also Seattle Pac. Univ. v. Ferguson*, 104

18 F.4th 50, 59 (9th Cir. 2024) (applying *Driehaus* factors).

19      In *Peace Ranch*, the Ninth Circuit analyzed standing using the *Driehaus* formulation of

20 the factors, while "acknowledg[ing] that the Ninth Circuit has toggled between these two tests."

21 *Peace Ranch,* 93 F.4th at 487.  As the Ninth Circuit utilized the *Driehaus* formulation of the

22 factors in more recent pre-enforcement cases, this Order also does so.  *See Peace Ranch*, 93 F.4th

23 at 487; *Seattle Pac. Univ.*, 104 F.4th at 59.[13]

24      Because "standing is not dispensed in gross," *Davis*, 554 U.S. at 734 (citation omitted),

---

[13] The parties' briefing analyzed standing using the Ninth Circuit's earlier formulation of the
25 factors.  However, under either formulation, the factors cover substantially the same
26 considerations, and the outcome would be the same. *See Unified Data Servs.*, 39 F.4th at 1210 n.9
27 (stating Ninth Circuit's test is "a means of determining whether a purported injury meets
[*Driehaus*'s] 'credible threat' requirement"); *Peace Ranch*, 93 F.4th at 487 (stating *Driehaus* test
28 incorporates essence of Ninth Circuit test).

1     *each Plaintiff* bears the burden to show injury in fact *as to each challenged section of title 5 of the*

2     *California Code of Regulations* and as to *the challenged provisions in the Faculty Contract*. Each

3     Plaintiff must establish as to each such provision that he or she intends to engage in speech

4     arguably affected by a constitutional interest, that such intended speech is arguably proscribed by

5     the challenged provision, and that the threat of future enforcement of that provision against him

6     or her is substantial. *See Driehaus*, 573 U.S. at 159 (citation omitted).

7        Plaintiffs bring facial challenges asserting that the provisions of the regulations and

8     Faculty Contract discriminate against viewpoint, compel speech, are impermissible prior

9     restraints, and are overbroad in violation of the First Amendment, and that they are impermissibly

10    vague in violation of the First and Fourteenth Amendments. Plaintiffs can facially challenge the

11    provisions only if plaintiffs themselves have standing to challenge them. *Lopez*, 630 F.3d at 785-

12    86 ("Even when plaintiffs bring an overbreadth challenge to a speech restriction, i.e., when

13    plaintiffs challenge the constitutionality of a restriction on the ground that it may

14    unconstitutionally chill the First Amendment rights of parties not before the court, they must still

15    satisfy 'the rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to

16    invoke a federal court's jurisdiction.'" (quoting *Dream Palace v. County of Maricopa*, 384 F.3d

17    990, 999 (9th Cir. 2004))).

18        As addressed below, Plaintiffs have not established standing to bring this pre-enforcement

19    claim as to any of the challenged provisions.

20       **A.**     **Faculty Contract**

21          **1.**     **Intent to Engage in Conduct Affected with a**

22              **Constitutional Interest**

23        First, to allege standing as to the Faculty Contract, each Plaintiff must allege "an intention

24    to engage in a course of conduct" that is "arguably affected with a constitutional interest." *Id*. To

25    adequately allege his or her intention to engage in a course of conduct, each Plaintiff must plead

26    the "specific" conduct in which he or she intends to engage. *Driehaus*, 573 U.S. at 161. Each

27

28

1  Plaintiff must allege a plan to engage in the course of conduct "with some degree of concrete

2  detail," including "information about the 'when, to whom, where, or under what circumstances,'"

3  that he or she plans to do so.  *Unified Data Servs.*, 39 F.4th at 1210-11 (citing *Lopez*, 630 F.3d at

4  786-87).  "Without these kinds of details, a court is left with mere 'some day' intentions which do

5  not support a finding of the actual or imminent injury that our cases require."  *Id.* (quoting *Lopez*,

6  630 F.3d at 787-88) (cleaned up).

7           In cases where plaintiffs would be unable to control or predict the when, to whom, where,

8  and under what circumstances they plan to break the law, due to the inherently unpredictable

9  nature of the intended conduct, the Ninth Circuit has held that such plaintiffs can show that they

10  have a concrete plan to violate the law at issue when they already violated the law in the past.  For

11  example, in *Tingley*, a therapist was found to have adequately pleaded his intent to violate a law

12  banning conversion therapy, where he did not specify when, to whom, where, or under what

13  circumstances he planned to do so, given that he "[could not] control when clients will come to

14  him for help changing their sexual orientation or gender identity," but where "his complaint

15  describe[d] 'specific past instances' of working with minors in a way that would violate the law"

16  and alleged he intended to continue doing so.  47 F.4th at 1068.

17           Any properly pleaded intended conduct must also be affected with a constitutional

18  interest.  The Ninth Circuit has instructed that this inquiry "does not require [the Court] to engage

19  in a mini litigation of the claims."  *Peace Ranch*, 93 F.4th at 488.  Rather, "standing in no way

20  depends on the merits" and the Court shall "take as true all material allegations in the complaint

21  and construe the complaint in favor of the plaintiff," as required at this point of the litigation.  *Id.*

22  at 488 (cleaned up).

23           Plaintiffs allege actions that they wish to do but fear they cannot because of the challenged

24  provisions of the Faculty Contract, or that they refuse to do although they believe that such

25  actions are mandated by the Faculty Contract.  Plaintiffs have sufficiently alleged, with the

26  requisite specificity, their intent to engage in at least some such conduct – that is, they have

27  adequately pleaded the "when, to whom, where, or under what circumstances" they would engage

28  in such conduct, or they have engaged in such conduct previously and the conduct is the sort

16

1  anticipated by *Tingley*. *See* 47 F.4th at 1068. Such intended conduct, under Plaintiffs' theories, is

2  also arguably affected with a constitutional interest.

3          Thus, Plaintiffs have met prong one for alleging that they have suffered an injury in fact

4  sufficient to confer standing. However, as noted below, they fail to allege that such intended

5  conduct is arguably proscribed by the challenged provisions of the Faculty Contract or that there

6  exists a credible threat of enforcement of the provisions against them.

7                  **2.      Whether the Intended Conduct is Arguably**

8                          **Proscribed by the Faculty Contract**

9          Plaintiffs must allege that their intended conduct is arguably proscribed by the challenged

10  provisions of the Faculty Contract.[14] To support their asserted fear of engaging in their intended

11  conduct, Plaintiffs repeatedly point to provisions of the DEI Recommendations, Model Principles,

12  and Glossary of Terms, and to a lesser extent, the regulations. Plaintiffs allege that, to avoid

13  violating the Faculty Contract, they refrain from taking actions such as discussing competing

14  views and controversial issues regarding DEIA matters; teaching "controversial facts"; and

15  assigning or showing certain materials in their classes that they have previously assigned or

16  shown, such as recorded debates regarding controversial topics, the film *Hidden Figures*, and

17  works by various authors, including Martin Luther King Jr., Victor Davis Hanson, William

18  Falkner, Flannery O'Connor, Booker T. Washington, W.E.B. Dubois, Malcolm X. They allege

19  that they fear such actions could be considered "weaponiz[ing] academic freedom," "inflict[ing]

20  curricular trauma," or would not be considered to "promote a race-conscious and intersectional

21  lens" or to be sufficiently "culturally affirming."

22          Plaintiffs further allege that they would like to criticize DEIA principles, within and

23  without their evaluations, but fear such criticism will be deemed a "racial ideology" that

24  "perpetuates racial inequalities and denies systematic racism." De Morales also asserts she fears

25  emphasizing the importance of merit because she may "be accused of protect[ing] White

26

27  _____

    [14] The Ninth Circuit has advised that this analysis also need not become a merits analysis. *See*
    *Peace Ranch*, 93 F.4th at 489. However, the challenged provision must still be applicable to the
28  plaintiff, "either by its terms or as interpreted by the government." *Lopez*, 630 F.3d at 786.

1    Privilege under the guise of standards." She and Blanken also state that they wish to continue

2    teaching about prominent chemists without referring to their races or ethnicities but fear it would

3    be considered as failing to adopt "culturally responsive practices and a social justice lens."

4        However, the provisions in the guidance documents and regulations to which plaintiffs

5    object are largely not stated in, or incorporated by, the Faculty Contract. And the Faculty

6    Contract itself, which is what plaintiffs' claims against the district defendants challenge, does not

7    proscribe plaintiffs' intended conduct. As addressed below, the regulations also do not proscribe

8    plaintiffs' proposed conduct. Moreover, most of the regulations apply only to the districts, not to

9    individual district employees. Nor are the DEI Recommendations, Model Principles, or Glossary

10   of Terms binding on Plaintiffs, as they have not been adopted pursuant to the regulatory

11   process.[15]

12       The DEI Recommendations, Model Principles, or Glossary of Terms reflect that they are

13   to be used by districts as a reference and as guidance when they create their local policies and that

14   they do not contain mandatory requirements. *See generally* Compl. Ex B (describing the DEI

15   Recommendations as a "set of *sample* DEI competencies and criteria," noting that districts "are

16   *strongly recommended* to use these DEI competencies and criteria as a baseline to develop [local]

17   DEI competencies and criteria," stating what the district's local process "*may include*," and

18   providing for every listed theme a "*recommended* description" of that theme) (emphases added);

19   Compl. Ex. C (stating "[t]his *guidance* is intended to assist community colleges in achieving

20   these objectives") (emphasis added); Compl. Ex. D (stating that committee that created the Model

21   Principles was charged with "developing *guidance*" and that "[t]he chart *is not exhaustive* and *is*

22   *not intended to be a mandate*, but rather a model and tool") (emphases added); Compl. Ex. E

23   (stating "purpose of . . . Glossary of Terms is to serve as *a reference guide* of DEI terms")

24   (emphasis added).

---

25   [15] *See* State Defs.' MTD 12 & n.1 (citing Cal. Cmty. Colls. Chancellor's Off., Procedures and

26   Standing Orders of the Board of Governors 22 (Dec. 2022), https://www.ccccco.edu/-
     /media/CCCCO-Website/docs/procedures-standing-orders/december-2022-procedures-standing-

27   ordersv2-a11y.pdf?la=en&hash=FF692A0AE8ACC8FE6BB2A4D75018302005A8A4D6

28   ("Neither the Board nor the Chancellor may administer or enforce any regulation . . . unless that
     regulation is adopted in accordance with the provisions of this Chapter.")).

Plaintiffs attempt to overcome the non-binding nature of the guidance documents, and the fact that the guidance documents do not apply directly to Plaintiffs, by asserting that violating the guidance documents would in turn violate the Faculty Contract. *See* Compl. ¶¶ 59, 73, 83. They assert that the Faculty Contract incorporates the regulations and the guidance documents. *See* Compl. ¶¶ 59, 73, 83. However, the Faculty Contract, which is attached as an exhibit to the complaint, contradicts Plaintiffs' assertion. *See* Compl. Ex. F. The Faculty Contract does not cite to or incorporate by reference the regulations or guidance documents, and it does not include most of the language from the regulations and guidance documents to which Plaintiffs object. *See* Compl. Ex. F; *see also* Compl. Exs. B-E. The complaint's assertion that the Faculty Contract incorporates these documents cannot be credited given that it is refuted by the Faculty Contract itself, which is attached to, and incorporated by reference in, the complaint. *See Martinez v. Newsom*, 46 F.4th 965, 971 (9th Cir. 2022) (citation omitted) (noting that allegations in complaint need not be credited if contradicted by documents referred to in complaint).

In their supplemental briefing, Plaintiffs rely on a declaration by Julianna D. Mosier, Vice Chancellor of Human Resources at SCCCD, and an email from SCCCD Human Resources titled "DEIA Competencies & Faculty Evaluations," to support their contention that the Faculty Contract incorporates the regulations and the guidance documents. Doc. 63 (citing Docs. 24-1, 29-4). However, these documents do not contradict the plain language of the Faculty Contract, which does not include, cite to, or incorporate by reference the language in the guidance documents or regulations to which Plaintiffs object. Plaintiffs cite to language from the Mosier declaration stating that the parties negotiating the Faculty Contract "decided at that time to incorporate *principles* from the proposed versions of the DEIA regulations into the agreement in anticipation of their formal adoption." Doc. 24-1 ¶ 3 (emphasis added). The SCCCD Human Resources email similarly states that the parties negotiating the Faculty Contract, in anticipation of the regulations, "*added language* to [the Faculty Contract] to address the changes." Doc. 29-4 (emphasis added). The email then notes the language of the Faculty Contract that faculty will be bound by, and notably does not include the language of the regulations or of any of the guidance documents. *See id.* Moreover, the Mosier declaration also states that the district "has some

1  further choices to make regarding implementation," that the district plans "to complete an

2  evaluation form for faculty that will incorporate principles from the new regulations, and

3  *potentially* some of the guidance documents," and that the Glossary of Terms "is for guidance

4  only we understand" but that faculty "are *welcome to* use the [Glossary of Terms] as a reference."

5  *Id.* ¶¶ 4, 11 (emphases added).

6        To the extent the Faculty Contract incorporated certain "principles" from the regulations

7  or included certain "language," the Faculty Contract's terms speak for themselves.  A review of

8  the Faculty Contract confirms that it does not incorporate the entirety of the guidance documents

9  or the regulations, and, specifically, does not include most of the language in the guidance

10  documents or regulations to which Plaintiffs object.  *See* Compl. Ex. F.  Thus, to show that their

11  intended conduct arguably violates the Faculty Contract, Plaintiffs must point to language of the

12  Faculty Contract.

13        A few allegations in Plaintiffs' complaint arguably raise objections to the following

14  language in the Faculty Contract:  The Faculty Contract requires that faculty be evaluated, in part,

15  on their "[d]emonstration of, or progress toward, diversity, equity, inclusion and accessibility

16  (DEIA)-related competencies, and teaching and learning practices that reflect DEIA and anti-

17  racist principles, and reflect knowledge of the intersectionality of social identities, illustrate a

18  developing set of skills for effective cross-cultural teaching, and recognize the myriad of ways in

19  which people differ, including the psychological, physical, cognitive, and social differences that

20  occur among individuals, all to improve equitable student outcomes and course completion."

21  Compl. Ex. F, at 42-43.  And as part of the evaluation process, the faculty member must

22  "demonstrate an understanding of diversity, equity, inclusion and accessibility (DEIA)

23  competencies and anti-racist principles, and how they have put those principals [sic] into practice

24  to improve equitable student outcomes and course completion."  Compl. Ex. F, at 41.

25        For example, Plaintiff Palsgaard alleges he fears that discussing controversial issues in

26  DEIA matters or presenting competing views on those issues in his classes may not be

27  sufficiently "anti-racist" or that assigning certain works, such as Martin Luther King Jr.'s *Letter*

28  *from Birmingham Jail*, may violate the Faculty Contract by offering differing perspectives on

"anti-racism" and "intersectionality."  Compl. ¶ 118.  Plaintiffs Blanken and de Morales allege that they will not include DEIA material unrelated to Chemistry in their classes because it would take up time otherwise spent on teaching chemistry and would be pedagogically unsound. Compl. ¶¶ 30, 152, 156, 159, 170, 177.  However, while Plaintiffs allege that they fear discussing controversial issues relating to DEIA principles, or that they do not want to teach DEIA principles, they fail to allege anything in the Faculty Contract, or in any other SCCCD requirement, mandating *what* professors teach or how any DEIA principles should be implemented.

While the Faculty Contract provides that further training will "ensure that all have a uniform understanding of the DEIA competencies and criteria" and "the expectations regarding a [faculty] member's performance related to the competencies and criteria," Compl. Ex. F, at 46, Plaintiffs' complaint does not include any description of such training or of any expectations that were conveyed to faculty members at such training.  While that is understandable given that the complaint was filed before such training was to occur, plaintiffs have not supplemented the record with any evidence of the training provided to faculty members since the complaint was filed. Moreover, as noted by the District Defendants, there appear to be many ways Plaintiffs could meet the Faculty Contract's requirement to implement DEIA principles, including among other options:  a professor could anonymously grade students' work, create opportunities to discuss feedback with students, have flexible office hour times, or incorporate student choice into the educational experience.  *See* Dist. Defs.' MTD 19.  These do not require a professor to teach any viewpoint or content concerning DEIA principles.

Plaintiffs also allege that they fear discipline or termination if they continue to share their criticism of DEIA and anti-racism principles in their evaluations and otherwise, but the Faculty Contract does not preclude Plaintiffs from voicing differing beliefs regarding DEIA principles. There is no allegation that the District Defendants have interpreted the Faculty Contract to prevent Plaintiffs from stating their beliefs regarding DEIA principles during their evaluations or in other contexts.  Rather, the District Defendants have confirmed that Plaintiffs' "proposed future actions do not violate . . . the faculty evaluation provisions of the District's Faculty

21

1    Contract." Dist. Defs.' MTD 10. In sum, though Plaintiffs have not plausibly pleaded that their

2    intended conduct is proscribed by the Faculty Contract. *See Lopez*, 630 F.3d at 786 (noting

3    government's interpretation of challenged provision is applicable both as to whether intended

4    conduct would violate the challenged provision and whether government intends to enforce

5    provision against plaintiffs).

6           Plaintiffs also bring a vagueness claim as to the Faculty Contract. The Ninth Circuit

7    instructs that "vagueness allegations must be taken as true for the purpose of determining

8    standing." *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023). As with their other claims,

9    Plaintiffs' vagueness challenge is largely based on language in the guidance documents and, to a

10   lesser extent, the regulations. *See* Compl. ¶ 312. However, as addressed above, the Faculty

11   Contract largely does not incorporate the language from these documents to which Plaintiffs

12   object, and the guidance documents and the regulations do not apply to Plaintiffs' intended

13   conduct. So, while the Court must accept the allegations of vagueness as true for the purposes of

14   standing, the asserted vague language, *see* Compl. ¶ 299, is largely not applicable to Plaintiffs'

15   conduct and cannot support a finding for Plaintiffs on the second prong.  To the extent the

16   complaint alleges that the following phrases in the Faculty Contract are impermissibly vague –

17   "diversity, equity, inclusion, and accessibility (DEIA) related competencies," "DEIA and anti-

18   racist principles," and "the intersectionality of social identities" (Compl. ¶ 313) – plaintiffs'

19   vagueness allegations are conclusory. In contrast, Plaintiffs repeatedly indicate that they are

20   aware of and oppose these principles. They indicate that they intend to oppose and criticize

21   diversity, equity, inclusion, accessibility, and anti-racist principles; to offer perspectives that are

22   different from the principles; and/or to refuse to adopt or promote the principles. *See, e.g.*,

23   Compl. ¶¶ 117-19, 124, 148, 158, 166.[16] Thus, Plaintiffs have also not met the second prong as to

24   their vagueness claim.

25   _____

26   [16] Plaintiffs allege generally that the State and district failed to provide sufficient guidance on the meaning of the terms in the regulations and Faculty Contract. Compl. ¶ 301. However, the Faculty Contract indicates that a training and presentation "to ensure that all have a uniform

27   understanding of the DEIA competencies and criteria, the expectations regarding a [faculty] member's performance related to the competencies and criteria, and best practices on how to

28   assess that during the evaluation process" was forthcoming. Compl. Ex. F, at 46. The complaint

1

### 3.   Substantial Threat of Enforcement

2       Whether a plaintiff has shown a "substantial threat" of enforcement "often rises or falls

3   with the enforcing authority's willingness to disavow enforcement." *See Peace Ranch*, 93 F.4th

4   at 490 (citation omitted).  "Of course, [the defendants'] disavowal must be more than a mere

5   litigation position." *Lopez*, 630 F.3d at 788 (citation omitted).  Here, the District Defendants have

6   confirmed that "Plaintiffs' proposed future actions do not violate" the Faculty Contract or the

7   DEIA regulations.  Dist. Defs.' MTD 10.  In Plaintiffs' opposition to Defendants' motions to

8   dismiss, they claim, without support, that the State Defendants' disavowal of any enforcement of

9   "the DEIA Rules" as to Plaintiffs' alleged intended conduct was "made as a convenient litigation

10   position."  Pls.' Opp. 29.  Plaintiffs make no such assertion regarding the District Defendants'

11   disavowal regarding the provisions of the Faculty Contract.  *See generally* Pls.' Opp.

12   Nonetheless, given that Plaintiffs allege that the regulations and guidance documents were

13   incorporated into the Faculty Contract, the Court will also address whether the District

14   Defendants' disavowal of the applicability of the Faculty Contract to Plaintiffs' intended conduct

15   appears to be a mere litigation position.

16       It does not.  The District Defendants state that they would not consider any of Plaintiffs'

17   intended conduct to violate any provision of the Faculty Contract or the regulations.  Dist. Defs.'

18   MTD 10.  They further confirm that "the District has made no indication that Plaintiffs are

19   prohibited from presenting certain viewpoints or perspectives in their classrooms, nor

20   communicated that Plaintiffs[] will be disciplined, terminated, or otherwise punished for doing

21   so" and that "[t]here is also no history of the District issuing poor faculty evaluations based on

22   that faculty member's presentation of controversial ideas, viewpoints, or perspectives as a

23   teaching tool."  Dist. Defs.' MTD 10.  Additionally, Plaintiffs do not allege any specific threat of

24   enforcement by the District Defendants or any history of enforcement of these provisions.  Nor do

25   plaintiffs allege any history of the district issuing poor faculty evaluations based on that faculty

26

---

27   does not address that training and what it required of faculty members.  It is not clear on the
present record when or whether the training referenced in the Faculty Contract occurred, or what
28   it included.

1  member's presentation of controversial ideas, viewpoints, or perspectives as a teaching tool.  *See*

2  *generally* Compl.; Dist. Defs.' MTD 10.  In this context, the District Defendants' representation is

3  not a mere litigation position.  *Cf. Lopez*, 630 F.3d at 788 (citing example of disavowal that

4  should be ignored as mere litigation position, where government had dropped charges against

5  plaintiff based on challenged statute four days before hearing and was bringing similar charges

6  against others).

7      Thus, Plaintiffs have not shown that there is a substantial threat that these provisions of

8  the Faculty Contract will be enforced against them for their intended conduct, and thus Plaintiffs

9  have not adequately alleged injury in fact to support standing to bring a pre-enforcement

10  challenge to these provisions of the Faculty Contract.

11      **B.    Regulations**

12      Plaintiffs also bring facial claims that the sections of title 5 of the California Code of

13  Regulations that were added or amended in March 2023 discriminate against viewpoint, compel

14  speech, are an impermissible prior restraint, are overbroad in violation of the First Amendment,

15  and are impermissibly vague in violation of the First and Fourteenth Amendment.

16      **1.    Intent to Engage in Conduct Affected with a**

17      **Constitutional Interest**

18      As noted above, Plaintiffs have adequately alleged an intent to engage in conduct affected

19  with a constitutional interest.  However, as discussed below, they have failed to allege that such

20  conduct is arguably proscribed by the regulations or that there is a substantial threat of

21  enforcement of the regulations against them for such conduct.

22      **2.    Conduct Arguably Proscribed by Regulations**

23      Plaintiffs seek a declaration "that the provisions of Title 5 of the California Code of

24  Regulations added or amended by the [the regulations] are facially unconstitutional under the

25  First and Fourteenth Amendments."  Compl. Prayer for Relief (a).  Based on Exhibit A to the

26  complaint, the amended or added sections of title 5 of the California Code of Regulations at issue

27  are sections 52510, 53400, 53401, 53402, 53403, 53425, 53601, 53602, 53605.  *See* Compl.

28  Ex. A.

24

Section 52510 lists definitions that apply to the chapter. Cal. Code Regs. tit. 5, § 52510. These impose no substantive obligations on Plaintiffs and thus cannot arguably proscribe any of their intended conduct.

Section 53400 defines the scope of the subchapter. *Id.* § 53400. The only amendment was to delete some of the text. *See id.* The remaining text reads "[t]his subchapter implements provisions of the Education Code that govern the minimum qualifications for employment in a community college district as an administrator, a faculty member, or a member of the classified staff." *Id.* This section also does not impose any substantive obligations on Plaintiffs and thus cannot arguably proscribe any of their intended conduct.

Section 53401 was amended to read "Community service classes, and contract classes that are not credit or non-credit offerings are exempt from the provisions of this chapter, except those provisions related to the advancement of diversity, equity, inclusion, and accessibility principles." *Id.* § 53401. Plaintiffs do not allege that they teach community service classes or contract classes that are not credit or non-credit offerings, so this provision is inapplicable to Plaintiffs. It also imposes no substantive obligations. For these reasons, it cannot arguably proscribe any of their intended conduct.

Section 53402 was deleted. *Id.* § 53402. Therefore, it also cannot arguably proscribe any of Plaintiffs' conduct.

Section 53403 was not amended in any significant way.[17] *Id.* § 53403. It provides that notwithstanding changes to the minimum qualifications established, the governing board of a community college district may continue to employ a person to teach if at the time that he or she was initially hired he or she was qualified pursuant to the minimal qualifications in effect at that time. *Id.* This directive is aimed at districts and imposes no substantive obligation on Plaintiffs. It also does not arguably proscribe any of Plaintiffs' conduct.

Section 53425 provides that "[i]n addition to the category-specific qualifications required by this chapter, all district employees shall demonstrate the ability to work with and serve

---

[17] Some language was moved around and "he or she" was changed to "they."

1    individuals within a diverse community college campus environment as required by local policies

2    regarding DEIA competencies."[18]  *Id.* § 53425.  This section imposes a substantive obligation on

3    Plaintiffs, *i.e.*, that they "demonstrate the ability to work with and serve individuals within a

4    diverse community college campus environment" as required by the Faculty Contract.  *See id.*  As

5    noted above, Plaintiffs have not alleged any conduct that arguably would be proscribed by the

6    Faculty Contract.  Thus, none of Plaintiffs' intended conduct is arguably proscribed by this

7    section of the California Code of Regulations.

8         Section 53601 provides that "[t]he Chancellor shall adopt and publish guidance describing

9    DEIA competencies and criteria in collaboration with system stakeholder groups" and that "[t]he

10   DEIA guidance shall be maintained to include current and emerging evidence-based practices

11   developed within the California Community Colleges, or described in DEIA-related scholarship."

12   *Id.* § 53601(a).  Like other sections, this imposes no substantive obligation on Plaintiffs; rather it

13   requires the Chancellor of the Board of Governors to act.  It therefore cannot be said to arguably

14   proscribe any of Plaintiffs' conduct.[19]  Section 53601 further provides that "[t]he DEIA

15   competencies and criteria identified by the Chancellor shall be used as a reference for locally

16   developed minimum standards in community college district performance evaluations of

17   employees and faculty tenure reviews."  *Id.* § 53601(b).  Again, this imposes an obligation on

18   SCCCD, and not on Plaintiffs – that is, that SCCCD use the Chancellor's guidance as a reference

19

20

21   [18] Plaintiffs' position is that the Faculty Contract constitutes the district's "local policies regarding DEIA competencies" anticipated by section 53425.  *See, e.g.*, Doc. 63 at 4.  In the District

22   Defendants' response to Plaintiffs' supplemental briefing, they indicate that the district's locally developed competencies are not before the Court.  *See* Doc. 67 at 5-6.  This factual discrepancy

23   does not impact the Court's analysis because Plaintiffs' challenge is to the regulations and the Faculty Contract, whether or not the latter constitutes the local policies referenced by section

24   53425.  Accordingly, the Court analyzes whether Plaintiffs' have standing to challenge the provisions of the Faculty Contract and the regulations.

25

26   [19] As noted throughout, the DEI Recommendations themselves also do not impose obligations on Plaintiffs.  Section 53601 describes them as "guidance" and as a "reference."  *Id.* § 53601(a)-(b).

27   They are non-binding on the districts in the districts' drafting of local policies.  It is also a district's local policies that would potentially apply to faculty, not the DEI Recommendations.

28

1    when adopting its standards for its performance evaluations and faculty tenure reviews.  Nothing

2    Plaintiffs allege is arguably be proscribed by this section.

3            Section 53602 provides a list of actions that districts – not faculty – must take.  *Id.*

4    § 53602.  These include "adopt[ing] policies for the evaluation of employee performance,

5    including tenure reviews, that requires demonstrates, or progress toward, proficiency in the

6    locally-developed DEIA competencies." *Id.* § 53602(a).  It further specifies that such evaluations

7    must "include consideration of an employee's demonstrated, or progress toward, proficiency in

8    diversity, equity, inclusion, and accessibility DEIA-related competencies that enable work with

9    diverse communities, as required by section 53425" and that "[d]istrict employees must have or

10    establish proficiency in DEIA-related performance to teach, work, or lead within California

11    community colleges." *Id.* § 53602(b).  Finally, section 53602 mandates districts, in an effort "[t]o

12    advance DEIA principles in community college employment," to "(1) include DEIA

13    competencies and criteria as a minimum standard for evaluating the performance of all

14    employees; (2) ensure that evaluators have a consistent understanding of how to evaluate

15    employees on DEIA competencies and criteria; (3) set clear expectations regarding employee

16    performance related to DEIA principles, appropriately tailored to the employee's classification;

17    (4) place significant emphasis on DEIA competencies in employee evaluation and tenure review

18    processes to support employee growth, development, and career advancement; (5) ensure

19    professional development opportunities support employee development of DEIA competencies

20    that contribute to an inclusive campus and classroom culture and equitable student outcomes; (6)

21    ensure an evaluation process that provides employees an opportunity to demonstrate their

22    understanding of DEIA and anti-racist competencies; [and] (7) include proposed or active

23    implementation goals to integrate DEIA principles as a part of the district's Equal Employment

24    Opportunity Plan required by section 53003." *Id.* § 53602(c).  As with other sections, these

25    provisions impose no substantive obligations on Plaintiffs.[20]  Rather, they require only SCCCD to

26    act.  None of Plaintiffs intended conduct is, or could be, arguably proscribed by these provisions.

27    _____

28    [20] The only provision arguably applicable to Plaintiffs is that "[d]istrict employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California

1    Section 53605 provides that "[f]aculty members shall employ teaching, learning, and

2    professional practices that reflect DEIA and anti-racist principles, and in particular, respect for,

3    and acknowledgement of the diverse backgrounds of students and colleagues to improve

4    equitable student outcomes and course completion." *Id.* § 53605(a).  While this provision

5    arguably imposes a direct obligation on Plaintiffs, as addressed above with respect to similar

6    language in the Faculty Contract, this provision does not mandate what professors teach or how

7    any such DEIA principles should be implemented.  For the same reasons that Plaintiffs' intended

8    conduct does not arguably violate the similar provision of the Faculty Contract, it also does not

9    arguably violate section 53605.[21]

10    In sum, Plaintiffs have not shown that their intended conduct is arguably proscribed by the

11    regulations.

12    Plaintiffs' fail to meet the second prong as to their vagueness challenge to the regulations

13    for the same reasons they failed to meet it for their challenge to the Faculty Contract.  The only

14    phrase they arguably allege is impermissibly vague that is contained within the regulations, and

15    not merely within the guidance documents, is "practices that reflect DEIA and anti-racist

16    principles."  Compl. ¶ 299; *see also* § 53605(a).  However, as with the similar phrase in the

17    Faculty Contract, plaintiffs' vagueness allegation is conclusory.  In contrast, Plaintiffs repeatedly

18    indicate that they are aware of and oppose DEIA and anti-racist principles, asserting that they

19    intend to criticize such principles and will not adopt or promote them.  Thus, Plaintiffs have also

20    not met the second prong as to their vagueness claim.

21

22

---

23    community colleges." *Id.* § 53602(b).  However, in the context of the entirety of section 53602, which describes what districts must include in their locally developed policies and evaluation
24    procedures, it is best understood as a mandate to districts to require this of their employees, rather than as a mandate to Plaintiffs.  Regardless, Plaintiffs have not adequately pleaded that their
25    intended conduct would violate this provision, even if it were directly applicable to them.

26
[21] Section 53605(b) and 53605(c) impose a mandate on educational and other administrators and
27    on staff members, respectively.  *Id.* § 53605(c)-(d).  Plaintiffs are all full-time faculty members. Thus, these sections do not apply to Plaintiffs and cannot arguably proscribe any of Plaintiffs'
28    intended conduct.

1          **3.**        **Substantial Threat of Enforcement**

2          Plaintiffs have also failed to show a substantial threat of enforcement of the regulations

3     against them for their intended conduct.  As noted above, whether a plaintiff has shown a

4     "substantial threat" of enforcement "often rises or falls with the enforcing authority's willingness

5     to disavow enforcement."  *See Peace Ranch*, 93 F.4th at 490 (citation omitted).  "Of course, [the

6     defendants'] disavowal must be more than a mere litigation position."  *Lopez*, 630 F.3d at 788

7     (citation omitted).  The State Defendants maintain that the regulations do not apply directly to

8     Plaintiffs, and thus, there cannot exist any credible fear of enforcement of them against Plaintiffs.

9     State Defs.' MTD 16.  Moreover, the State Defendants confirm that they "cannot and will not

10    take any action against Plaintiffs concerning their speech."  State Defs.' MTD 19.  Rather, "[a]ll

11    decisions regarding employee hiring, employment practices, performance evaluation, and

12    potential termination are the responsibility of the district."  State Defs.' MTD 19 (citing Cal.

13    Educ. Code § 70901(b)(1)(B)).  The State Defendants have further stated their belief that the

14    specific actions Plaintiffs purportedly intend to take – including assigning certain literary works,

15    such as Martin Luther King Jr.'s *Letters from Birmingham Jail*, discussing Marie Curie's

16    contributions to the field of chemistry, or otherwise using the methodologies and course materials

17    in their classrooms that they have previously used – would not be precluded by the regulations.

18    *See* State Defs.' MTD 19.

19         Plaintiffs assert generally, without more, that the State Defendants' disavowal of any

20    intent to enforce the regulations against them "is made as a convenient litigation position."  Pls.'

21    Opp. 29.  However, the State Defendants confirm not only that they *will not* take action, but that

22    they *cannot* take action against Plaintiffs, as they are not the responsible authority under state law.

23    State Defs.' MTD 19 (citing Cal. Educ. Code § 70901(b)(1)(B)); *see also* Cal. Code Regs. tit. 5,

24    § 53602 (establishing that the district, not the Board of Governors of the California Community

25    Colleges, is responsible for employee evaluations).  Plaintiffs do not point to any basis to question

26    this position or to discount the State Defendants' representation that Plaintiffs' intended actions

27

28

1    would not violate the regulations.[22]  Therefore, the Court concludes that the State Defendants'

2    have disavowed any intent or ability to take any action against Plaintiffs for their intended

3    conduct, which weighs heavily in favor of finding that Plaintiffs are not poised to suffer an injury

4    in fact.

5         Plaintiffs do not assert that there has been a specific threat of enforcement of the

6    regulations against them.  Nor do Plaintiffs assert a past history of enforcement of the regulations

7    that would support a finding of a credible threat of enforcement of the regulations against them.

8    Plaintiffs do not allege any past enforcement of the regulations against similarly situated faculty.

9    *See generally* Compl.  Though the history of enforcement carries less weight when, as here, the

10   challenged provision "is relatively new[,] and the record contains little information as to

11   enforcement," *Tingley*, 47 F.4th at 1069, this factor still weighs in favor of finding that there is no

12   credible threat of enforcement.[23]

13        Plaintiffs nonetheless argue that "[b]ecause a 'chilling of the exercise of First Amendment

14   rights is, itself, a constitutionally sufficient injury,'" this Court "should 'assume a credible threat

15   of prosecution in the absence of compelling contrary evidence.'"  Pls.' Opp. 21, 28 (citing

16   *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) and *Speech First,*

17   *Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)).  While self-censorship to avoid running afoul

18   of a statute can amount to an injury in fact, *see, e.g.*, *Wolfson v. Brammer*, 616 F.3d 1045, 1059-

19   60 (9th Cir. 2010), "self-censorship alone is insufficient to show injury."  *Unified Data Servs.*, 39

20   F.4th at 1211 (citing *Lopez*, 630 F.3d at 792).  Indeed, "[t]he self-censorship door to standing

21   does not open for every plaintiff."  *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088,

22   1095 (9th Cir. 2003).  And Plaintiffs "may [not] challenge the constitutionality of a statute on

23   First Amendment grounds by nakedly asserting that [their] speech was chilled by the statute."  *Id.*

24   Plaintiffs have failed to show a reasonably likelihood that the State Defendants will enforce the

25   regulations against them for their intended conduct.  To the extent that Plaintiffs have self-

26   ───────────────

     [22] As noted above, the regulations largely do not apply directly to Plaintiffs.

27

28   [23] Plaintiffs filed a supplemental brief on October 18, 2024.  They did not bring to the Court's
     attention any enforcement of the regulations since the filing of the complaint.

                                            30

censored, such "injury" is self-inflicted and does not constitute an injury in fact that can support standing.

For the foregoing reasons, Plaintiffs have failed to allege that there exists a credible threat of enforcement of the regulations against them.

**IV.     Conclusion and Order**

Plaintiffs have not adequately alleged that they face an injury that is "actual or imminent," and they have therefore failed to establish standing as required to invoke this Court's jurisdiction. *See Lujan*, 504 U.S. at 560.  As Plaintiffs have failed to establish standing, their complaint must be dismissed without prejudice.  *See Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) ("[D]ismissals for lack of Article III jurisdiction must be entered without prejudice because a court that lacks jurisdiction is powerless to reach the merits." (internal quotations and citations omitted)).

For the reasons explained above:

1.   Defendants' motions to dismiss (Docs. 42, 43) are granted;

2.   Plaintiffs' complaint (Doc. 1) is dismissed without prejudice;

3.   Plaintiffs' motion for preliminary injunction (Doc. 13) and related request for judicial notice regarding such motion (Doc. 35) are denied as moot; and

4.   The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   January 27, 2025

_____
UNITED STATES DISTRICT JUDGE